**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| In Re: Children's National Subpoena No. 25-1431-028 | Case No.: |
| | _____ |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO LIMIT SUBPOENA DUCES TECUM**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 7

BACKGROUND ............................................................................................................... 8

LEGAL STANDARD ....................................................................................................... 14

ARGUMENT ..................................................................................................................... 16

    I.    The Requests (Request Nos. 11-13) Lack Proper Investigative Purpose and Are Irrelevant to the Government's FDCA Investigation................................................................................. 16

    II.    The Government's Novel Interpretation of the FDCA Does Not Withstand Scrutiny and is an Insufficient Basis to Demand Patient-Centric Information................................................... 19

    III.    The Privacy Interests of CNH Patients Outweigh DOJ's Need for Access ................. 22

        *i.*    *Westinghouse Factors 1 and 2: (1) The Type of Record Requested and (2) The Information It Does or Might Contain.* .............................................................................. 22

        *ii.*    *Westinghouse Factor 3: The Potential for Harm in Any Subsequent Nonconsensual Disclosure* ............................................................................................................................ 25

        *iii.*    *Westinghouse Factor 5: The Injury from Disclosure to the Relationship in Which the Record Was Generated* ...................................................................................................... 26

        *iv.*    *Westinghouse Factor 4: The Adequacy of Safeguards to Prevent Unauthorized Disclosure* ............................................................................................................................ 27

        *v.*    *Westinghouse Factor 6 and 7: The Degree of Need for Access and Whether There is an Express Statutory Mandate, Articulated Public Policy, or Other Recognizable Public Interest Militating Toward Access* ............................................................................................... 28

CONCLUSION.................................................................................................................. 29

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*In re 2025 Subpoena to Children's National Hospital,*
1:25-cv-03780-JRR, Dkt. No. 23 (D. Md. Jan. 21, 2026) ............................................... *passim*

*In re 2025 UPMC Subpoena,*
2025 WL 3724705 (W.D. Pa. Dec. 24, 2025).................................................................14

*In re Admin. Subpoena No. 25-1431-019,*
800 F. Supp. 3d 229 (D. Mass. 2025) ...................................................................14, 19

*In Re: Administrative Subpoena 25-1431-032,*
No. 4-26MC-006-0 (N.D. Tex. Apr. 30, 2026)...................................................................19

*Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,*
771 F. Supp.3d 717 (D. Md. 2025) ...................................................................23

*Buckman v. Plaintiffs' Legal Comm.,*
531 U.S. 341 (2001)...................................................................21

*In re: Dep't of Just. Admin. Subpoena No. 25-1431-030,*
2026 WL 33398 (D. Colo. Jan. 5, 2026)...................................................................14, 19, 20

*Doe v. Broderick,*
225 F.3d 440 (4th Cir. 2000) ...................................................................23

*Doe v. United States,*
253 F.3d 256 (6th Cir. 2001) ...................................................................17

*Appeal of FTC Line of Bus. Rep. Litig.,*
595 F.2d 685 (D.C. Cir. 1978)...................................................................15

*Haw. Psychiatric Soc., Dist. Branch of Am. Psychiatric Ass 'n v. Ariyoshi,* 481 F.
Supp. 1029, 1038 (D. Haw. 1979) ...................................................................24

*Hillsborough Cnty. v. Automated Med. Lab'ys Inc.,*
471 U.S. 707 (1985)...................................................................22

*Murray v. Pittsburgh Bd. of Educ.,*
759 F. Supp. 1178 (W.D. Pa. 1991)...................................................................24, 26

*N.L.R.B v. Interbake Foods, LLC,*
637 F.3d 492 (4th Cir. 2011) ...................................................................16

*Oklahoma Press Pub. Co. v. Walling,*
327 U.S. 186 (1946)...................................................................15

*United States ex rel. Palmieri v. Alpharma, Inc.*,
  No. CV ELH-10-1601, 2016 WL 7324629 (D. Md. Dec. 16, 2016)......................................21

*Patients of Dr. Solomon v. Bd. of Physician Quality Assurance*,
  85 F. Supp. 2d 545 (D. Md. 1999) ...............................................................................16

*QueerDoc, PLLC v. Dep't of Just.*,
  807 F. Supp. 3d 1295 (W.D. Wash. 2025)................................................................14, 18

*Reich v. Nat'l Eng'g & Contracting Co.*,
  13 F.3d 93 (4th Cir. 1993) ...........................................................................................15

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
  678 F.3d 235 (3d Cir. 2012).........................................................................................21

*In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods.*
  *Liab. Litig.*,
  401 F. Supp. 3d 538 (D. Md. 2019) ..............................................................................21

*In re Subpoena Duces Tecum*,
  228 F.3d 341 (4th Cir. 2000) ..................................................................................15, 17

*In re Subpoena Duces Tecum No. 25-1431-016*,
  2025 WL 3562151 (W.D. Wash. Sept. 3, 2025)........................................................14, 18

*In re Subpoena No. 25-1431-014*,
  810 F. Supp. 3d 555 (E.D. Penn. 2025) ..................................................................... *passim*

*In re Subpoenas Duces Tecum Nos. A99-0001, A99-0002, A99-0003 and A99-*
  *0004*,
  51 F. Supp. 2d 726 (W.D. Va. 1999) ...........................................................................16

*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950)...................................................................................................17

*United States v. Skrimetti*,
  605 U.S. 495 (2025)...................................................................................................22

*United States v. Westinghouse Elec. Corp.*,
  638 F.2d 570 (3d Cir. 1980)................................................................................... *passim*

*Walls v. City of Petersburg*,
  895 F.2d 188 (4th Cir. 1990) .......................................................................................16

*Wash. Legal Found. v. Henney*,
  202 F.3d 331 (D.C. Cir. 2000) .....................................................................................21

*West Virgina v. EPA,*
   597 U.S. 697 (2022) ............................................................................................23

*In re Zofran (Ondansetron) Prods. Liab. Litig.,*
   541 F. Supp. 3d 164 (D. Mass. 2021), *aff'd,* 57 F.4th 327 (1st Cir. 2023) ............................21

**Statutes**

5 U.S.C. § 552a ............................................................................................29

18 U.S.C. § 3486 ............................................................................ *passim*

21 U.S.C. §301 ............................................................................................8

21 U.S.C. §§ 331 ............................................................................................18

21 U.S.C. § 396 ............................................................................................21, 22

D.C. CODE § 2-1401.02(12A) ............................................................................................10

D.C. CODE § 2-1461.01 ............................................................................................10

MD. CODE ANN., CRIM. PROC. § 9-106(b)(2) ............................................................................................10

MD. CODE ANN., HEALTH-GEN. § 15-151(a)(2)(i)-(ii) ............................................................................................10

MD. CODE ANN., STATE PERS. & PENS. § 2-312(a)(3)(ii), (c) ............................................................................................10

5 U.S.C. § 552a(b)(7) ............................................................................................29

**Other Authorities**

45 C.F.R. § 160.103 ............................................................................................25

65 Fed. Reg. 82462, 82464 (Dec. 28, 2000) ............................................................................................24

U.S. Const. amend. IV ............................................................................................15, 17

Exec. Order No. 13181 ............................................................................................28

Exec. Order No. 14168 ............................................................................................10

Executive Order 14187 ............................................................................................11

Mem. From Att'y Gen., *Preventing the Mutilation of American Children* (Apr. 22,
   2025), https://www.justice.gov/ag/media/1402396/dl ............................................................................................11, 29

*Whether the Food & Drug Administration Has Jurisdiction Over Articles Intended for Use in Lawful Executions*, 43 Op. O.L.C. 81 (2019) ...........................................................................................21

**INTRODUCTION**

This Motion is simple. It does not seek novel relief. It does not ask the Court to determine an unsettled question of law. Instead, it asks the Court to extend the *same* relief previously granted to eight Children's National Hospital ("CNH") patients and their families to *all similarly situated CNH patients*. On January 1, 2026, the Hon. Julie Rubin (D. Md.) issued an order limiting the Government's legal authority to demand the patient information and medical records of eight patients (and their families) who received medical treatment for gender dysphoria at CNH. *In re 2025 Subpoena to Children's National Hospital*, 1:25-cv-03780-JRR ("Patient Litigation"), Dkt. No. 23 at 12 (D. Md. Jan. 21, 2026) ("Patient Opinion"). That ruling should apply with equal force to all of CNH's patients affected by the Government's demand. Critically, the Patient Opinion made several findings that are determinative to the instant Motion.

*First*, the Court observed that the Government failed to provide any "articulated basis to suspect [CNH] of violations of the [Federal Food, Drug, and Cosmetic Act ('FDCA'), 21 U.S.C. § 301 *et seq.*,] . . . and surely none that would call for disclosure of [patient] records." *Second*, the Court determined that the Government provided no particularized basis to suspect CNH "of misbranding or distributing drugs, or any other conduct, as proscribed by the FDCA." *Id.* at 14. *Third*, the Court rejected the Government's proffered connection between its investigation of potential FDCA violations and its demands for "adolescent patient records, including patient names, dates of birth, social security numbers, parent information, clinical indications, diagnoses, and parent authorization forms." *Id. Fourth*, the Court concluded the interest "in maintaining the privacy of . . . sensitive medical records outweigh[ed] any interest of the Government in calling for their production." *Id.* at 15.

That reasoning holds true as to all patients who received medical treatment for gender dysphoria at CNH. Accordingly, CNH requests that the Court extend its holding to all affected

CNH patients—joining federal courts nationwide that have already rejected the purported basis of the Government's investigation—and limit the Supoena's requests for highly sensitive patient information of an unquestionably unique and vulnerable patient population.

## BACKGROUND

For more than 150 years, CNH has served as a world-class provider of pediatric health services to children in Maryland, Virginia, and the District of Columbia ("D.C.") operating approximately 47 clinical facilities throughout the region.[1] As an independent, non-profit institution with longstanding roots in the community, CNH is committed to delivering high-quality, compassionate care to every child.

CNH has provided care to children and adolescents, including those diagnosed with gender dysphoria, through its Gender Development Program for decades.[2] CNH's provision of gender care services aligns with its foundational mission of "[p]roviding a quality healthcare experience for [] patients and families" that is "evidence-based" and informed by "research findings."[3]

---

[1] *About Us*, CHILDREN'S NATIONAL, https://www.childrensnational.org/about-us (last visited May 7, 2026); *About Us: Our Health System*, CHILDREN'S NATIONAL, https://www.childrensnational.org/about-us/our-health-system (last visited May 8, 2026).

[2] *Gender Development Program*, CHILDREN'S NATIONAL, https://www.childrensnational.org/get-care/departments/gender-development-program (last visited May 7, 2026).

[3] *About Us*, CHILDREN'S NATIONAL, https://www.childrensnational.org/about-us (Last visited May 7, 2026); Ex. A at ¶ 8, Declaration of Dr. Nathan Kuppermann (hereinafter, "Kuppermann Decl."); *Gender Development Program*, CHILDREN'S NATIONAL, https://www.childrensnational.org/get-care/departments/gender-development-program (last visited May 7, 2026).

Importantly, gender-affirming care is lawful in all jurisdictions where CNH operates. Specifically, Maryland[4] and D.C.[5] have multiple statutory protections regarding gender-affirming care, and in Virginia, gender-affirming care is permissible.

Nonetheless, the current administration has consistently voiced its opposition to medical treatment for gender dysphoria in minors, including before the last election and since taking office. Indeed, the administration campaigned vigorously on transgender issues,[6] and promised "[o]n Day 1, [to] sign an executive order instructing every federal agency to cease the promotion of sex or gender transition at any age."[7] True to its promise, on January 20, 2025, the President issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."[8] The Order (1) mandated that all federal agencies recognize only two biological sexes and (2) rescinded Biden-era executive orders and guidance documents that protected or promoted gender-affirming care in federal programs.[9]

---

[4] Gender-affirming care is "[l]egally protected health care" under Maryland law. MD. CODE ANN., STATE PERS. & PENS. § 2-312(a)(3)(ii), (c); MD. CODE ANN., HEALTH-GEN. § 15–151. Specifically, the Maryland Code defines "gender-affirming treatment" as "any medically necessary treatment consistent with current clinical standards of care prescribed by a licensed health care provider for the treatment of a condition related to the individual's gender identity," and includes hormone therapy, a variety of physical alterations, and fertility procedures. MD. CODE ANN., HEALTH-GEN. § 15-151(a)(2)(i)-(ii). Further, under Maryland law, the Governor cannot surrender a person to another state if the alleged act involves providing, procuring, or aiding "legally protected health care services." MD. CODE ANN., CRIM. PROC. § 9-106(b)(2).

[5] Pursuant to the D.C. Code, "[t]he District and its officers and employees" are prevented from assisting in "any interstate investigation or proceeding seeking to impose civil or criminal liability" for "[p]roviding, consenting to, receiving, or facilitating gender-affirming care." D.C. CODE § 2-1461.01(a)(7), (b). Likewise, the D.C. Code defines "[g]ender-affirming care" as "any social, psychological, behavioral, medical, or surgical intervention that is lawful in the District and that is designed or employed to support or affirm a person's gender identity or expression, including hormone therapy, behavioral healthcare, reproductive counseling, hair removal, speech therapy, facial reconstruction surgery, and gender affirmation surgery." D.C. CODE § 2-1401.02(12A).

Notably, D.C. does not recognize court-issued foreign jurisdiction subpoenas without a sworn statement that it does not further any investigation or proceeding to impose criminal or civil liability for "[p]roviding, consenting to, receiving, or facilitating gender-affirming care." D.C. CODE §§ 2-1461.01(a)(7), 13-449 (incorporating D.C. CODE § 2-1461.01(a) to define scope of applicability for heightened subpoena domestication requirements).

[6] Michel Martin & Mansee Khurana, *What Trump's Win Could Mean for Transgender Health Care Access, Athletes*, NPR (Nov. 16, 2024), https://www.npr.org/2024/11/15/nx-s1-5181967/what-trumps-reelection-could-mean-for-transgender-health-care-access.

[7] *Id.* (quoting President Trump at an August 2024 event).

[8] Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025).

[9] *Id.*

Likewise, on January 28, 2025, the President issued Executive Order 14187, titled "Protecting Children from Chemical and Surgical Mutilation," which provided that "[a]cross the country today, medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions."[10] The Order defined "chemical and surgical mutilation" as "the use of puberty blockers . . . to delay the onset or profession of normally timed puberty in an individual who does not identify as his or her sex"; "the use of sex hormones . . . to align an individual's physical appearance with an identity that differs from his or her sex"; and "surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex." *Id.* § 2(c). The Order also clarified that "[c]hemical and surgical mutilation . . . sometimes is referred to as 'gender affirming care.'" *Id.*

Subsequently, the Department of Justice ("DOJ") moved to actualize these executive orders and policy goals concerning gender-dysphoria treatment in minors. On April 22, 2025, former U.S. Attorney General Pamela J. Bondi issued a memorandum titled "Preventing the Mutilation of American Children."[11] The Bondi Memo announced DOJ's enforcement priorities, which included, in part, the investigation of alleged violations of the FDCA by manufacturers and distributors making false claims about on-label and/or off-label provision of puberty blockers and sex hormones, in addition to evaluating whether claims submitted by healthcare providers in connection with gender-affirming care violated the False Claims Act. *Id.* at 4. The Bondi Memo also announced that DOJ would launch "[t]he Attorney General's Coalition Against Child Mutilation," pursuant to which DOJ would "partner with state attorneys general to identify leads,

---

[10] Exec. Order 14187, 90 Fed. Reg. 8771 (Feb. 3, 2025).
[11] Mem. From Att'y Gen., *Preventing the Mutilation of American Children* (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl ("Bondi Memo").

share intelligence, and build cases against hospitals practitioners violating federal or state laws banning female genital mutilation and other, related practices." *Id.* at 5.

The Government's actual goal to eliminate gender-affirming care for minors, in contrast to the purported focus of its investigations, have been stated explicitly in various mediums. For example, in response to CNH's decision to discontinue the prescription of gender-affirming medications, on July 21, 2025, former Attorney General Bondi tweeted: "At President Trumps' direction, @TheJusticeDept will continue enforcing the law against institutions like Children's National that mutilate children under the guise of medical care."[12] Four days later, on July 25, 2025, the White House published a press release titled "President Trump Promised to End Child Sexual Mutilation – and He Delivered." The press release lists seventeen hospitals—including CNH—that have paused or terminated gender-affirming care for minor patients.[13]

On July 3, 2025, DOJ served CNH with an administrative subpoena (the "Subpoena") issued pursuant to 18 U.S.C. § 3486. *See* Ex. B, Subpoena. The Subpoena contains fifteen requests for documents that seek nearly every document related to CNH's patients, staff, and providers concerning the provision of gender-affirming care over the last five and a half years. The Subpoena seeks highly sensitive personal information and medical records of minor patients, and personnel records for almost all medical employees a CNH, extensive billing and diagnosis coding materials, and communications with pharmaceutical manufacturers, compounding pharmacies, and government agencies. *Id.*

---

[12] Attorney General Pamela Bondi (@AGPamBondi), X, *At President Trump's direction, @TheJusticeDept will continue enforcing the law against institutions like Children's National that mutilate children under the guise of medical care. History will remember @POTUS as a champion on this crucial issue.* (July 21, 2025, at 14:28 ET), https://x.com/AGPamBondi/status/1947362978526814579.

[13] Press Release, The White House, President Trump Promised to End Child Sexual Mutilation – and He Delivered (July 25, 2025), https://www.whitehouse.gov/releases/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/.

Since receiving the Subpoena, CNH has worked diligently to comply with its requests and provide the Government with the documents and information necessary for its investigation, while protecting the substantial privacy interests of a highly vulnerable patient population and their families. *See* Ex. C April 17, 2026 CNH Letter to the DOJ in re Subpoena. Throughout its interactions with DOJ, CNH has consistently conveyed its commitment to complying with the Subpoena while expressly reserving its rights concerning the production of personal health information ("PHI") and other patient information. *Id.* In addition to making this position clear in its conversations with the Government, CNH explicitly reserved its rights in each production letter sent to DOJ, stating in part:

> [T]he provision of the enclosed documents is not intended to waive and does not waive any argument that CNH may make as to the issue of patient health information ("PHI") and patient medical records requested in the Subpoena. Should there be any disagreement or litigation between the parties concerning the issue of disclosing PHI and/or medical records pursuant to the Subpoena, the parties agree that this production does not constitute a waiver by CNH.

*Id.*

As relevant to CNH's motion to limit, CNH objects to Request Nos. 11, 12, and 13, and the Subpoena's Requests generally to the extent they seek sensitive patient information.

- Request 11: "Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."

- Request 12: "For each such patient identified in Subpoena [Request 11], documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy."

- Request 13: "All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11], including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks."

CNH has communicated with the Government on several occasions since the issuance of the Subpoena last July about its requests for sensitive patient information. However, on March 30,

12

2026, without warning and contrary to its previously collaborative approach, the Government requested CNH's final position regarding the production of responsive documents containing PHI, patient medical records, and other patient-centric information.[14] Accordingly, CNH submits this Motion to limit the Government's enforcement of the Subpoena as to such information.

## I. The Subpoena's Requests for Patient Information Has Already Been Limited

On January 21, 2026, the Hon. Julie Rubin (D. Md.) granted movants'[15] motion to quash the Subpoena issued to CNH, limiting the production of movants' patient information. In doing so, Judge Rubin joined every court to have substantively analyzed the identical subpoena—holding that DOJ's Subpoena issued to CNH lacked any proper investigatory purpose under law.[16]

The Court concluded, in no uncertain terms, that the Subpoena "was not issued for a legitimate governmental purpose, is not limited to any legitimate purpose, and is oppressive in its breadth,"[17] and consequently quashed Request Nos. 11 to 13, and any other Request to the extent it sought production of CNH's patient information. Despite the Court observing that the Subpoena "appear[ed] to have no purpose other than to intimidate and harass [CNH] and Movants, and those similarly situated," Patient Op. at 15, the Court limited relief only to the moving parties. *Id.* at 15.

---

[14] The Government's demand for Patient Records *excluded* the eight moving patients encompassed by the Court's prior Order quashing the Subpoena.

[15] Movants were eight families who received gender transition medical care, for either themselves or their children, through CNH's Gender Development Program from January 1, 2020 through [November 11, 2025]. CNH Patient Litigation, Dkt. No. 12 (Memo. Of Law ISO Mot. to Quash) (filed Nov. 11, 2017) (granted Jan. 21, 2026).

[16] *In Re. 2025 Subpoena to Children's National Hospital*, No. 25-mc-00709 (JRR), 1, 11 (D. Md. Jan. 21, 2026); *See e.g., In re Subpoena Duces Tecum No. 25-1431-016,* 2025 WL 3562151, at *17 (W.D. Wash. Sept. 3, 2025) (granting Seattle Children's Hospital's motion to set aside subpoena) (denying government's motion to alter or amend judgment); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025) (granting Boston Children's Hospital's motion to quash subpoena); *QueerDoc, PLLC v. Dep't of Just.*, 807 F. Supp. 3d 1295, 1304 (W.D. Wash. 2025) (granting QueerDoc's motion to quash subpoena); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 607 (E.D. Penn. 2025) (granting Children's Hospital of Philadelphia's motion to limit subpoena); *In re 2025 UPMC Subpoena*, 2025 WL 3724705, at *3 (W.D. Pa. Dec. 24, 2025) (granting patients and former patients of UPMC's motion to quash subpoena requests 11-13) (rejecting government's proposal of anonymized patient productions); *see also In re: Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *11 (D. Colo. Jan. 5, 2026) (Chung, M.J.) (recommending that the district court grant Children's Hospital Colorado's motion to quash subpoena).

[17] Patient Op. at 1, 11.

Nonetheless, the Court described the Subpoena as "an overreach untethered to any lawful purpose *no matter who seeks protection from the court*." *Id.* (emphasis added). The relief granted to the eight CNH patients (and their families) should be extended to *all affected* CNH patients.

## LEGAL STANDARD

Although an agency's investigative powers are broad, "they are not unlimited, and are subject to judicial review '[t]o protect against mistaken or arbitrary orders.'" *Appeal of FTC Line of Bus. Rep. Litig.*, 595 F.2d 685, 702 (D.C. Cir. 1978) (citing *United States v. Morton Salt Co.*, 338 U.S. 632, 640 (1950)). Therefore, because an administrative subpoena results in the "compulsory production of private papers," a subpoenaed entity "is entitled to the Fourth Amendment's protection against unreasonableness." *In re Subpoena Duces Tecum*, 228 F.3d 341, 347 (4th Cir. 2000) (emphasis in original) (citing *Hale v. Henkel*, 201 U.S. 43, 76 (1906)).

To satisfy the Fourth Amendment, the Fourth Circuit has held that an administrative subpoena must be:

> (1) authorized for a legitimate government purpose; (2) limited in scope to reasonably relate to and further its purpose; (3) sufficiently specific so that a lack of specificity does not render compliance unreasonably burdensome; and (4) not overly broad for the purposes of the inquiry as to be oppressive.

*In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000).[18]

The Supreme Court has described the court's function in assessing "issues of authority to conduct the investigation, relevancy of the materials sought, and breadth of the demand [as] *neither minor nor ministerial matters*." *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 217 n. 57 (1946) (emphasis added). "While judicial scrutiny of administrative subpoenas is, to be sure, limited . . . courts do not simply order the enforcement of subpoenas as a matter of course, and

---

[18] *See also Reich v. Nat'l Eng'g & Contracting Co.*, 13 F.3d 93, 98 (4th Cir. 1993) (citation omitted).

14

certainly not blindly." *N.L.R.B v. Interbake Foods, LLC*, 637 F.3d 492, 498-99 (4th Cir. 2011) (internal citations omitted).

The Fourth Circuit has recognized that the constitutional right to privacy is extended to the interest "in avoiding disclosure of personal matters, and . . . in independence in making certain kinds of important decisions." *Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990) (citing *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977)). In evaluating whether the information requested is entitled to privacy protection, courts assess whether the records sought are "within an individual's reasonable expectations of confidentiality." *Id.* "The more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny." *Id.* (citing *Fraternal Order of Police Lodge 5 v. Philadelphia*, 812 F.2d 105, 112-113 (3d Cir. 1987)).

Because Request Nos. 11 to 13 implicate pediatric patient identities and intimate medical records, the Government "has the burden to prove that a compelling governmental interest in disclosure outweighs the individual's privacy interest." *Id.* (citing *Carey v. Population Servs. Int'l*, 431 U.S. 678, 686 (1977)). In weighing the government's interests in disclosure against the individual's privacy interest, courts in the Circuit have applied the seven factors discussed in *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570 (3d Cir. 1980)[19]:

> (1) The type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Westinghouse*, 638 F.2d at 578.

---

[19] *See also Patients of Dr. Solomon v. Bd. of Physician Quality Assurance*, 85 F. Supp. 2d 545, 547 (D. Md. 1999); *In re Subpoenas Duces Tecum Nos. A99-0001, A99-0002, A99-0003 and A99-0004*, 51 F. Supp. 2d 726, 738 (W.D. Va. 1999).

**ARGUMENT**

CNH respectfully requests that the Court limit the Subpoena to the extent it seeks personally identifying patient information, including but not limited to Request Nos. 11 to 13, for three reasons. As an initial matter, the demanded records—which call for the production of patient information including mental and psychosocial evaluations, diagnoses, treatment explanations, intake assessments, and informed consent forms—lack a proper investigative purpose and are irrelevant to the Government's proffered investigation pursuant to the FDCA. Further, the Government's novel and rejected theory of FDCA liability, under which hospitals and providers could face liability for prescribing FDA-approved drugs to treat gender dysphoria and related conditions, is contrary to established precedent and upends traditional understandings of federalism. Finally, the privacy interests in patient information overwhelmingly outweigh the Government's need for such information.

**I.    The Requests (Request Nos. 11-13) Lack Proper Investigative Purpose and Are Irrelevant to the Government's FDCA Investigation**

Despite the Government being afforded latitude to conduct investigations, "an agency's investigatory powers [are not] boundless." Patient Op. at 12; *see also United States v. Morton Salt Co.*, 338 U.S. 632, 652-53 (1950) ("Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed investigatory power."). Consistent with this principle, the Government cannot use an administrative subpoena to demand records that are not reasonably related to the articulated basis of the subpoena. *See, e.g.*, *Doe v. United States*, 253 F.3d 256, 266 (6th Cir. 2001). If the scope of a subpoena is "not relevant to a legitimate investigation, and overly broad . . . [that] can support a claim of unconstitutionality under the Fourth Amendment." *In re Subpoena Duces Tecum*, 228 F.3d 341 at 348.

Here, the Government issued the Subpoena to CNH pursuant to 18 U.S.C. § 3486, through which Congress authorizes investigations into a "federal health care offense." *See* 18 U.S.C. § 3486(a)(1)(A)(i)(I), (a)(1)(A)(iii), (a)(1)(B)(i). The Government has repeatedly represented—including in litigation involving patients treated at CNH (*see, e.g.*, Declaration of Lisa K. Hsiao, Patient Litigation, Dkt. No. 15-1 (Dec. 15, 2025))—that its investigation concerns the potential "violation of, or a criminal conspiracy to violate" the FDCA. *See* Declaration of Lisa K. Hsiao at ¶ 9, *In Re: Admin. Subpoena No. 25-1431-014*, No. 2:25-MC-00054-MAK (E.D. Penn. Oct. 6, 2025); Declaration of Lisa K. Hisao at ¶ 9, Patient Litigation (Dec. 15, 2025); Declaration of Lisa K. Hsiao at ¶ 9, *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-mc-00041-JHC (W.D. Wash. Oct. 1, 2025).

Section 301 of the FDCA identifies unlawful conduct at the heart of the statute's enforcement provisions. *See* Jennifer Staman, Cong. Rsch. Serv., Enforcement of the Food, Drug, and Cosmetic Act: Select Legal Issues, Congressional Research Service (Feb. 9, 2018). Specifically, section 301 prohibits the "adulteration of misbranding of any . . . drug . . . in interstate commerce" and the "delivery or proffered delivery thereof for pay or otherwise." 21 U.S.C. §§ 331(a), (c); *see also* Patient Op. at 2 n. 2.

Request Nos. 11 to 13 concern PHI and other patient-centric information that has "little to do with investigating violation of FDCA." *QueerDoc, PLLC v. U.S. Dep't of Justice*, 807 F. Supp. 3d 1295, 1304 (W.D. Wash. 2025). The records demanded include patients' mental and psychosocial evaluations, diagnoses, treatment explanations, intake assessments, and informed consent forms. Critically, these records pertain to providers' treatment decisions and patient's sensitive health information wholly unrelated to the labeling, promotion, adulteration, or distribution of drugs into interstate commerce.

Courts that have substantively analyzed Request Nos. 11 to 13 have uniformly held that these requests are irrelevant to an FDCA investigation,[20] and instead, "concern how clinicians treated individual children and intimate clinical details shedding no light on whether the Hospital introduced a misbranded or unapproved drug into interstate commerce under the [FDCA] and Section 331." *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 579 (E.D. Pa. 2025); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 238 (D. Mass. 2025) (holding that Requests 1, 11 and 12 seek the personnel files of nearly all hospital employees and all medical records and personal information of patients "despite the tenuous link these medical records . . . would have to potential fraudulent billing codes and unlawful off-label promotion"). Request Nos. 11 to 13 constitute an effort by the Government to "create a dragnet designed to sweep in all patient data related to any prescription of puberty blockers or hormone therapy." *In re: Department of Justice Administrative Subpoena No. 25-1431-030*, No. 25-MC-00063-SKC-CYC, 2026 WL 33398, at *7 (D. Col. Jan. 5, 2026). As this Court observed, considering the Government's purported FDCA investigation, "it is unclear . . . why the Government demands production of adolescent patient records, including patient names, dates of birth, social security numbers, parent information, clinical indications, diagnoses, and parent authorization forms." Patient Op. at 14.

The Government has not provided any basis to suspect that CNH violated the FDCA. Notably, in litigation concerning the Subpoena issued to CNH, this Court observed that the Government provided "no basis on which it suspects [CNH] of misbranding or distributing drugs, or any other conduct, as proscribed by the FDCA." Patient Op. at 14; *see also id.* at 12 ("The

---

[20] The only district court to decide differently was the U.S. District Court for the Northern District of Texas, which issued its decision regarding a subpoena issued to Rhode Island Hospital, the same day the government filed its motion, within hours, without any filed opposition, and with no substantive analysis. *See In Re: Administrative Subpoena 25-1431-032*, No. 4-26MC-006-0 (N.D. Tex. Apr. 30, 2026).

Government fails to place before the court any information, record, or evidence supporting or pertaining to investigation of [CNH] for any 'health care offense.'").

Although the Government may desire investigating how CNH treats its patients, particularly, as to gender-affirming care, "the FDCA regulates commerce, not patient care." Patient Op. at 14 (citing *In re Subpoena No. 25-1431-014*, Misc Action No. 25-39, 2025 WL 3252648, at *17 (E.D. Pa. Nov. 21, 2025)); *see In re: Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *4 (D. Colo. Jan. 5, 2026) ("[g]iven that misbranding in the stream of commerce is the FDCA's focus, Requests 11 to 13, which seek personal health data 'have little to do with investigating violations of the FDCA'" (quoting *QueerDoc, PLLC v. U.S. Dep't*, 807 F. Supp. 3d 1295 (W.D. Wash. 2025))). Therefore, in light of Request Nos. 11 to 13's nebulous relevance to an FDCA investigation, and the lack of any articulated basis to suspect CNH of wrongdoing under that statute (or otherwise), the Patient Order applies with equal force here and the relevant Requests must be limited as to the entirety of the relevant CNH patient population.

## II. The Government's Novel Interpretation of the FDCA Does Not Withstand Scrutiny and is an Insufficient Basis to Demand Patient-Centric Information

Perhaps in recognition of the Subpoena's dubious legal foundation, the Government advances a novel theory of FDCA liability whereby hospitals and providers can be found liable under the FDCA for prescribing approved drugs for unapproved purposes. *See, e.g.*, Declaration of Lisa Hsiao at 4, 6-7, Patient Litigation, Dkt. No. 15-1 (D. Md. Jan. 15, 2026). According to the Government, the administration and prescription of an approved drug to treat gender dysphoria in minors could constitute unlawful conduct under the FDCA. The Government's dubious legal theory should be rejected.

*First*, the FDCA clearly provides, in part, that "[n]othing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any

legally marketed device to a patient for any condition or disease." 21 U.S.C. § 396. The FDCA

therefore envisions and permits healthcare providers to provide approved drugs [and devices] for

"off-label usage . . . or use 'for some other purpose than that for which [it] has been approved by

the FDA." *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods. Liab.*

*Litig.*, 401 F. Supp. 3d 538, 553 (D. Md. 2019) (citing *Shuker v. Smith & Nephew, PLC*, 885 F.3d

760, 766 (3d Cir. 2018)).

*Second*, both the FDA and courts have long recognized that off-label prescribing is

lawful.[21] This view is shared by DOJ's Office of Legal Counsel, which has stated that "[a]s a

general matter, FDA does not regulate the practice of medicine, which includes 'off-label'

prescribing," and that "[w]hile the FDCA bars a manufacturer or distributor from selling any drug

or device for an unapproved use, physicians may, with limited exceptions, prescribe and administer

FDA-approved drugs and devices for unapproved uses." *Whether the Food & Drug Administration*

*Has Jurisdiction Over Articles Intended for Use in Lawful Executions*, 43 Op. O.L.C. 81, 85

(2019).

---

[21] Food and Drug Admin., *Communications From Firms to Health Care Providers Regarding Scientific Information on Unapproved Uses of Approved/Cleared Medical Products; Questions and Answers; Guidance for Industry* 8-9 (Jan. 2025), https://www.fda.gov/media/184871/download (acknowledging various circumstances in which health care providers may validly prescribe drugs for off-label use); Food and Drug Admin., *Understanding Unapproved Use of Approved Drugs "Off Label"* (Feb. 5, 2018), https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label (noting that "health[ ] care providers generally may prescribe [approved] drugs for an unapproved use when they judge that it medically appropriate for their patient"); *see also, e.g., Buckman v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 350 (2001) (Off-label use "is an accepted and necessary corollary of the [Food and Drug Administration] 's mission to regulate in this area without directly interfering with the practice of medicine."); *United States ex rel. Palmieri v. Alpharma, Inc.*, No. CV ELH-10-1601, 2016 WL 7324629, at *3 (D. Md. Dec. 16, 2016) ("Federal law does not prohibit a physician for prescribing an approved drug for a non-approved, or 'off-label,' use."); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action,* 678 F.3d 235, 240 (3d Cir. 2012) ("Because the [Act] does not regulate the practice of medicine, physicians may lawfully prescribe drugs for off-label uses."); *In re Zofran (Ondansetron) Prods. Liab. Litig.,* 541 F. Supp. 3d 164, 173 (D. Mass. 2021), *aff'd,* 57 F.4th 327 (1st Cir. 2023) ("It is generally lawful for physicians to prescribe medications for purposes for which they have not been [Food and Drug Administration]-approved."); *Wash. Legal Found. v. Henney*, 202 F.3d 331, 333 (D.C. Cir. 2000) ("A physician may prescribe a legal drug to serve any purpose that he or she deems appropriate, regardless of whether the drug has been approved for that use by the [Food and Drug Administration].").

*Third*, the demanded patient-centric information does not—and cannot—constitute "labeling" under the FDCA. Under the FDCA, "labeling" concerns "written or graphic materials accompanying a drug *in commerce* . . . [and] not to internal medical records, informed consent forms, or physician-patient communications." *In re Administrative Subpoena No. 25-1431-014*, No. 2:25-mc-00039-MAK (E.D. Pa Nov. 21, 2025) Dkt. No. 43 at 25 (emphasis added) (citations omitted). Accordingly, the FDCA's "labeling" provisions are not aimed at hospitals or providers prescribing drugs, but the manufacturers and distributors responsible for the drug's labeling.

*Fourth*, the Government's theory of liability would upend both established FDCA precedent[22] and federalism principles. As previously stated, the FDCA does not regulate the practice of medicine and explicitly does not limit or interfere with the authority of a health care practitioner to prescribe or administer *any legally marketed device* to any patient for any condition or disease within a legitimate health care practitioner-patient relationship. 21 U.S.C. § 396.

The Supreme Court has routinely affirmed that the "regulation of health and safety is 'primarily, and historically, a matter of local concern.'" *Hillsborough Cnty. v. Automated Med. Lab'ys Inc.*, 471 U.S. 707, 719 (1985) (citation omitted). This principle was reaffirmed by the Supreme Court in *Skrimetti*, which recognized states are afforded "wide discretion" to legislate areas where there is significant policy debate—including gender affirming care. *United States v. Skrimetti*, 605 U.S. 495, 524 (2025). Consistent with these principles, all the primary jurisdictions in which CNH operates and provides services—Maryland, Virginia, and the District of Columbia—permit hospitals and providers to treat patients and prescribe medication for gender dysphoria and related conditions.[23] If the Government wants to disrupt these federalism principles, as evidenced by its novel FDCA theory, courts look for a clear indication that Congress intended

---

[22] *See supra* note 21.
[23] *See supra* notes 4-5.

to do so. *West Virgina v. EPA*, 597 U.S. 697, 722-24 (2022). No such congressional statement or intent is evident here.

### III.     The Privacy Interests of CNH Patients Outweigh DOJ's Need for Access

This Court already determined that because "the Government lacks a proper investigative purpose, and . . . the Subpoena demands production of information disconnected from a proper § 3486 subpoena related to investigation of suspected FDCA violations by [CNH]," that the moving patients "interest in maintaining the privacy of their sensitive medical records outweigh[ed] any interest of the Government in calling for their production." Patient Op. at 15. CNH requests that the Court reaffirm its prior holding as to CNH's pending motion.

The patient-centric records demanded by the Government are entitled to a reasonable expectation of privacy because such "records contain intimate and private details that people do not wish to have disclosed, expect will remain private, and, as a result, believe are entitled to some measure of protection from unfettered access by government officials."[24] Where here, the Government lacks proper purpose to demand patient-centric information pursuant to an FDCA investigation, the privacy interests of CNH's patients clearly outweigh the Government's need for the requested records—and provide an independent basis to limit the subpoena. *See Westinghouse*, 638 F.2d at 578.

#### A. The *Westinghouse* Factors Favor Protecting the Privacy Interests of Limiting the Subpoena

i.     *Westinghouse Factors 1 and 2: (1) The Type of Record Requested and (2) The Information It Does or Might Contain.*

---

[24] *Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000); *see also* Patient Op. at 15 (citation omitted); *Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp.3d 717, 781 (D. Md. 2025).

Request Nos. 12 and 13 of the Subpoena demand patient-centric information concerning assessments, diagnoses, and informed consent documents forming the basis to prescribe medication for patients with gender dysphoria and related conditions. Request No. 11 demands records exposing the patients associated with those diagnoses and assessments by names.

The records demanded by the Government concern the most intimate, sensitive, and at times, traumatic details of the lives of patients at CNH. As explained in CNH's accompanying declaration, the patient-centric records sought by Requests Nos. 11 to 13 are among the most sensitive that CNH maintains. Ex. D at ¶ 5, Declaration of Catherine Pearcy (hereinafter, "Pearcy Decl."). These records of CNH's pediatric patients contain deeply personal and sensitive information about patients' gender identity, mental and physical health, family dynamics, as well as information concerning third parties with whom the patient share a relationship—including parents, friends, siblings, teachers, and others. Pearcy Decl. at ¶ 5–6; Kuppermann Decl. at ¶ 12, 17. Likewise, over the course of receiving care at CNH, patients and families reveal sensitive personal details concerning, for example, sexual history, past trauma, family dynamics, bullying, harassment, and self-harm. Pearcy Decl. at ¶ 6; Kuppermann Decl. at ¶ 12.

The Government has acknowledged that such information is entitled to protection. In the context of psychotherapy notes, the Department of Health and Human Services ("HHS") has stated: "[i]f, in Justice Brandeis' words, the 'right to be let alone' mean anything, then it likely applies to having outsiders have access to one's intimate thoughts, words, and emotions." *See Dep't of Health and Hum. Servs.,* Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82462, 82464 (Dec. 28, 2000); *see also Murray v. Pittsburgh Bd. of Educ.*, 759 F. Supp. 1178, 1181 (W.D. Pa. 1991) ("There can be no doubt that [this] information [is] of the types most associated with expectations of privacy."); *Haw. Psychiatric Soc., Dist. Branch of Am.*

*Psychiatric Ass 'n v. Ariyoshi*, 481 F. Supp. 1029, 1038 (D. Haw. 1979) ("Many courts and commentators have concluded that, because of the uniquely personal nature of mental and emotional therapy, accurate diagnosis and effective treatment require a patient's total willingness to reveal the most intimate personal matters, a willingness that can exist only under conditions of the strictest confidentiality.")).

Moreover, "[i]nformation about an individual's reproductive health and associated health care is [] especially sensitive and has long been recognized as such." HIPPA Privacy Rule to Support Reproductive Health Care Privacy, 89 Fed. Reg. 32976, 32986, 3305 (Apr. 26, 2024) ("HIPAA Reproductive Health Privacy Rule"); *see also id.* 45 C.F.R. § 160.103 (defining "reproductive health care" as "health care . . . that affects the health of an individual in all matters relating to the reproductive system and to function and process").

Considering the Government's articulated goal of connecting these records with identifiers—including names, birth dates, and social security numbers—the risk and privacy interests are magnified. In fact, the records relating to Request Nos. 11 to 13 are far more sensitive and their potential disclosure is exponentially more significant than the records at issue in *Westinghouse*, which included "X-rays, blood tests, pulmonary function tests, hearing and visual tests." 638 F.2d at 579. Moreover, in light of the sheer number of patients, third parties, and records associated with each patient treated at CNH, anonymization, deidentification, or the use of pseudonyms would impose onerous burden and expense on CNH.[25]

---

[25] This Court has already rejected the Government's prior "suggestions that anonymizing . . . patient records cures the Subpoena's defects." Patient Op. at 15-16. That reasoning applies equally here.

*ii.* *Westinghouse Factor 3: The Potential for Harm in Any Subsequent Nonconsensual Disclosure*

Here, the risks and resulting harm from the disclosure of patient-centric records are real and not speculative. Courts "rank as an exceptionally serious matter" the "embarrassment" flowing from "the disclosure of sensitive personal information." *Murray*, 759 F. Supp. at 1182. As explained in the accompanying declaration, the compelled disclosure of sensitive personal information would be detrimental to the psychological health of the implicated children and adolescents—potentially exacerbating existing mental health conditions and triggering new mental health symptoms. Kuppermann Decl. at ¶ 15. Affected children and adolescents whose gender identity has not been shared with family, friends, classmates, colleagues, or others, face an even larger risk of harm to their mental health. *Id.*

Disclosure of patient-centric records to the Government would also be highly damaging. The Government has specifically requested patient information in an identifiable format, including "documents relating to informed consent, patient intake, and parent or guardian authorization." Request 13. The Government has repeatedly stated that it intends on using patient identities as "essential investigative leads," parents as potential "witnesses," and that "[p]atients (depending on age and circumstances) may provide information." *See* Declaration of Lisa Hsiao at 14, Patient Litigation, Dkt. No. 15-1 (D. Md. Jan 21, 2026) Dkt. No. 15-1; Declaration of Lisa Hsiao at 14, *In re Administrative Subpoena No. 25-1431-014*, No. 2:25-mc-00039-MAK (E.D. Pa Nov. 21, 2025) Dkt. No. 16-1. These threatened interactions with the Government—which may be undesired to most (if not all) patients—pose grave harm. And although the disclosure of patient information is independently harmful, *knowledge* of the Subpoena's request for patient information would also harm affected patients, their families, and other third parties. Kuppermann Decl. at ¶ 17, 18.

Accordingly, the harm associated with the compelled disclosure of records sought by the Subpoena is not hypothetical and cannot be overstated.

    iii.    *Westinghouse Factor 5: The Injury from Disclosure to the Relationship in Which the Record Was Generated*

Similarly, disclosure of the requested patient information records to the Government will harm the relationship in which the records were created—here, the sacrosanct relationship between the physician and patient. As Judge Mark Kearney of the Eastern District of Pennsylvania stated in limiting an identical subpoena:

> Patients and families who believe their medical records can be turned over to federal investigators will understandably hesitate to seek care, withhold critical information from their doctors, or avoid treatment for gender-affirming concerns[.] . . . This is not speculation; it is a rational response to a legitimate risk particularly given the rhetoric from federal law enforcement about persons seeking this care."

*In re Subpoena No. 25-1431-014*, 810 F. Supp.3d at 601.

The disclosure of patient-centric records will deter families from seeking lawful gender care and other treatments, discourage open candor between patients and providers, and harm trust between patients and physicians—integral for both accurate diagnosis and effective care. Families may be less willing to seek care at CNH, out of fear their most sensitive personal health information would later be subject to disclosure to the federal government. Kuppermann Decl. at ¶ 18–19. Families may face apprehension in being candid with providers, interfering with clinical communications with healthcare providers that are necessary to effectively diagnose and provide appropriate, quality care. *Id.* at ¶ 18. Erosion of trust between patients and families and providers will not be limited to the gender care patient population. *Id.* at ¶ 19. Patients and families seeking other types of care pertaining to sensitive conditions, such as mental health conditions, substance use disorders, reproductive health concerns, and sexually transmitted diseases, may also be wary of seeking care in fear their information may be subject to non-consensual disclosure. *Id.*

### B. The Other *Westinghouse* Factors Do Not Outweigh the Privacy Interest

*iv.*      *Westinghouse Factor 4: The Adequacy of Safeguards to Prevent Unauthorized Disclosure*

Factor four also weighs against the disclosure of patient-centric information. Significantly, no safeguards implemented to prevent the disclosure of patient-centric information in response to the Subpoena will prevent the resulting harm from *disclosure to the Government*.

The prospect of subsequent disclosure is not illusory. Under Section 3486, there is no broad prohibition against the Government disseminating patient-centric information obtained through the Subpoena. Although section 3486(e)(1) provides a "limitation on use," this provision only applies to disclosures "for use in . . . any administrative, civil, or criminal action or investigation directed *against the individual* who is the subject of the information." 18 U.S.C. §3486(e)—in simpler terms, investigations and actions against the patient.

Similarly, while DOJ's Justice Manual's section on Health Care Fraud provides that "[t]here are restrictions on the derivative use of protected health information," that same section cites an Executive Order that provides the Government does not "place any additional limitation on the derivative use of health information obtained by the Attorney Geneal pursuant to the provisions of 18 U.S.C. 3486." *See* U.S. Dep't of Just., Just. Manual, § 9-44.150 (Jan. 2020) (citing Executive Order 13181, To Protect the Privacy of Protected Health Information in Oversight Investigations (Dec. 20, 2000) ("E.O. 13181")), available at https://www.justice.gov/jm/jm-9-44000-health-care-fraud#9-44.100#9-44.100; *see also* E.O. 13181, § 1 ("Under 18 U.S.C. 3486, an individual's health records obtained for health oversight purposes pursuant to an administrative subpoena may not be used against that individual patient in an unrelated investigation by law enforcement unless a judicial officer finds good cause.").

Nor can the Court ignore the context in which the Subpoena was issued. The Government has already announced its intention to partner with states to address issues concerning the medical treatment for gender dysphoria, which includes "identify[ing] leads, shar[ing] intelligence, and build[ing] cases against hospital and practitioners." Bondi Memo at 5. In the absence of a broad prohibition of sharing, *see* 18 U.S.C. § 3486(e)(1); 5 U.S.C. § 552a(b)(7) (provision of the Privacy Act permitting disclosure to state law enforcement officials), the Government's professed desire to works with states more than suggests it may disseminate patient-centric information to advance its agenda against gender-affirming care. This manner of information sharing only increases the risk of sensitive information becoming public. *Cf. Westinghouse*, 638 F.2d at 580.

    v.        *Westinghouse Factor 6 and 7: The Degree of Need for Access and Whether There is an Express Statutory Mandate, Articulated Public Policy, or Other Recognizable Public Interest Militating Toward Access*

The final two factors weigh against disclosure of patient-centric information. As to Factor 6, this Court has already observed that "the Subpoena's demands production of information disconnected from . . . [an] investigation of suspected FDCA violations by [CNH]." Patient Op. at 15. Therefore, the records demanded in Request Nos. 11 to 13, and other patient centric information "do not meaningfully advance the [Government's] stated investigative purposes." *In re Subpoena No. 25-1431-014*, 810 F. Supp.3d at 604. As such, there is no need for the Government to have access to such records.

The Government can still investigate potential FDCA offenses without eviscerating patient privacy. For example, the Government can review and analyze CNH's billing and coding practices without learning what patients discussed with their providers. Likewise, the Government can access CNH's policies and practices regarding informed consent by reviewing policies and accompanying documentation provided to patients. The Government, however, does not need

unfettered access to patient-centric information, potentially traumatizing patients, families, providers, and other third parties in the process.

And with respect to Factor 7, CNH does not dispute and respects the latitude that 18 U.S.C. § 3486 provides the Government to investigate healthcare offenses. That deference, however, is neither unrestrained nor sufficient to justify the Subpoena's demand for patient-centric information. Where here, the Government has failed to provide CNH or "the court [with] any information, record, or evidence supporting or pertaining to [its] investigation," Patient Op. at 12, the privacy interest unequivocally outweighs the Government purported need for patient-centric information.

**CONCLUSION**

CNH respectfully moves to limit the Subpoena to the extent it seeks personally identifying patient information, including but not limited to Request Nos. 11 to 13.

Dated: May 8, 2026

Respectfully submitted,

BARNES & THORNBURG LLP

*/s/ Steven D. Shipe*
Steven D. Shipe (Bar No. 1306190282)
John E. Kelly (*pro hac vice* pending)
Jacquelyn Papish (*pro hac vice* pending)
Victor Obasaju (*pro hac vice* pending)
Barnes & Thornburg, LLP
555 12th Street, NW, Suite 1200
Washington, D.C. 20004
Steven.Shipe@btlaw.com
JKelly@btlaw.com
Jackie.Papish@btlaw.com
VObasaju@btlaw.com

Telephone: (202) 831-6731

*Counsel for Children's National Hospital*