# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Z.A., et al.,

Plaintiffs,

v.

TODD BLANCHE, in his official capacity as Acting Attorney General, et al.,

Defendants.

Case No. 26-cv-04998-PCP

**ORDER RE: MOTIONS FOR PROVISIONAL CLASS CERTIFICATION AND PRELIMINARY INJUNCTION**

Re: Dkt. Nos. 42, 45, 46

For over a year, the Department of Justice has been on a mission to "end" gender-affirming care for minors experiencing symptoms of gender dysphoria. One means to achieve that purpose has been to investigate providers of such care for evidence of purported fraud and violations of federal healthcare laws. As part of its campaign, DOJ has repeatedly sought to obtain private information about minor patients who have received gender-affirming care, including those who received care at the Lucile Packard Children's Hospital at Stanford. In July 2025, DOJ issued an administrative subpoena seeking, among other records, documents that would identify all minor patients who had received certain forms of gender-affirming care at Packard and disclose sensitive information about their clinical indications and diagnoses. Although Packard produced other records in response to the administrative subpoena, it did not produce the identifying patient data requested by DOJ, and other hospitals around the country successfully quashed substantially identical administrative subpoenas on the ground that DOJ lacked any legitimate interest in minor patients' sensitive health information.

After finding limited success in gaining access to transgender minors' medical records through the administrative subpoena process, DOJ adopted a new tactic in May 2026: issuing grand jury subpoenas to Packard and other providers of gender-affirming care. Though Packard is

United States District Court
Northern District of California

located in California and the other hospital known to have received such a subpoena is located in New York, DOJ issued both grand jury subpoenas under the seal of the Northern District of Texas.

The plaintiffs in this action either received gender-affirming care at Packard or are the parents of minors who received such care. They claim that DOJ's receipt of the patient records it seeks in the grand jury subpoena would violate their or their children's rights under the First, Fourth, and Fifth Amendments. To protect their private health information, plaintiffs now move for a temporary restraining order that would enjoin DOJ and Acting Attorney General Todd Blanche from obtaining their medical records. Plaintiffs seek such relief on behalf of both a putative class of individuals who received gender-affirming care as minors at any healthcare institution in California and a subclass of individuals who received such care at Packard.

In opposing plaintiffs' motion, DOJ does not meaningfully defend the propriety of its demand for patients' sensitive health information. Instead, DOJ contends that because it now seeks plaintiffs' medical records through issuance of a grand jury subpoena rather than through an administrative subpoena, plaintiffs' sole recourse is to file a motion to quash the subpoena in the issuing court pursuant to Federal Rule of Criminal Procedure 17. For the reasons that follow, the Court concludes, for purposes of plaintiffs' motion, that Rule 17 likely does not preclude plaintiffs from pursuing an action in this Court to enjoin the federal officials' ongoing efforts to procure their private medical information. And because plaintiffs have demonstrated a likelihood of success on their claim that DOJ's efforts, if successful, would infringe upon their constitutional privacy rights, the Court provisionally certifies a class of patients who received gender-affirming care at Packard and grants plaintiffs' request for preliminary injunctive relief as to that class.[1] Because the record does not establish that patients who received gender-affirming care at other Californian hospitals face a similar risk of injury, the Court denies plaintiffs' motions to the extent they seek provisional certification of a statewide class and statewide injunctive relief.

**BACKGROUND**

More than a million Americans "identify as transgender, meaning that their gender identity

[1] Given that plaintiffs' motion for a temporary restraining order has been fully briefed and argued by all parties, it is effectively a motion for a preliminary injunction, and the Court treats it as such.

does not align with their … sex" assigned at birth. *United States v. Skrmetti*, 605 U.S. 495, 501–02 (2025). Many transgender Americans "suffer from gender dysphoria, a medical condition characterized by persistent, clinically significant distress resulting from an incongruence between gender identity and … sex" assigned at birth. *Id.* at 502–03. "Left untreated, gender dysphoria may result in severe physical and psychological harms." *Id.* at 503. Common treatments for gender dysphoria include hormone therapy (i.e., "the use of hormones to induce the development of physical characteristics" consistent with a person's gender identity) and puberty blockers (i.e., treatments "designed to delay the development of physical sex characteristics" in younger transgender individuals). *Id.* at 503–04. These and related treatments for gender dysphoria are often referred to as "gender-affirming care."

Although "the generally accepted medical practice is to treat people who suffer from gender dysphoria with necessary, safe, and effective gender-affirming medical care," *Doe v. Horne*, 115 F.4th 1083, 1107 (9th Cir. 2024) (citation modified), *vacated on other grounds*, No. 24-449, 2026 WL 1871306 (U.S. June 30, 2026), recent years have seen "rising debates regarding the relative risks and benefits of such treatments" for minors. *Skrmetti*, 605 U.S. at 504. In *Skrmetti*, the Supreme Court held that the responsibility for resolving those debates falls on state legislatures. That is because the Constitution "afford[s] States 'wide discretion to pass legislation in areas where there is medical … uncertainty," which the Supreme Court held includes the use of "puberty blockers and hormones … for minors." *Id.* at 524. Exercising that discretion, many states have prohibited the provision of gender-affirming medical care to minors. *See id.* at 504. California has not. To the contrary, "gender-affirming health care services[] and gender-affirming mental health care services … are rights secured by the Constitution and laws of California[,]" and "[i]nterference with these rights … is against the public policy of California." Cal. Civ. Code § 1798.301. And California, like at least fifteen other states, has "taken steps to safeguard access to transgender healthcare" for both adults and minors, "exercising [its] sovereign judgment that such safeguards promote public health and wellbeing."[2]

[2] *See* Brief of Amici Curiae States in Support of Plaintiffs' Motion for a Temporary Restraining

Despite the Supreme Court "underscor[ing] the need for legislative flexibility in this area," *id.*, its counterparts in the Executive Branch have displayed significant antipathy for the choice of some state legislatures not to ban gender-affirming care for minors. On January 28, 2025, the President issued an executive order that expressly aimed to "end" gender-transition-related medical care for minors, which the order labelled "a stain on our Nation's history."[3] The executive order stated that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures."[4] The order included specific directives to DOJ to "prioritize investigations" of providers of gender-affirming care.[5] As the White House explained in an official statement, the "intended effect" of the President's executive order was to "prevent[]" children from receiving gender-affirming care and to pressure "[h]ospitals around the country … to downsize or eliminate their … 'gender-affirming care' programs[.]"[6]

Three months later, then-Attorney General Pamela Bondi issued a memorandum announcing various measures to combat the rise in youth "transgenderism" and to abate the provision of gender-affirming medical care to transgender minors, which the memorandum described as "radical gender experimentation."[7] One of those measures directed DOJ's Civil

---

Order, Dkt. No. 70, at 4–6 (documenting protections for transgender healthcare in California).

[3] Exec. Order No. 14187, 90 Fed. Reg. 8771, 8771 (2025).

[4] *Id.*

[5] *Id.* at 8772.

[6] *President Trump is Delivering on His Commitment to Protect Our Kids*, THE WHITE HOUSE (Feb. 3, 2025), https://www.whitehouse.gov/articles/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/ [https://perma.cc/DD9Z-WU7Q]. Plaintiffs cite this and other press releases, memoranda, and online articles in their amended complaint, motion for provisional class certification, and renewed motion for a temporary restraining order. Defendants have not objected to the Court's consideration thereof. The Court therefore exercises its discretion to consider such materials in resolving the instant motions. *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189 (9th Cir. 2024) (holding that district courts "may give even inadmissible evidence some weight" in resolving motions for preliminary relief); *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018) (holding that "the 'evidentiary proof' a plaintiff must submit in support of class certification … need not be admissible evidence").

[7] Memorandum from Attorney General Pamela Bondi to Select Component Heads, "Preventing the Mutilation of American Children," at 1, 3–6 (Apr. 22, 2025),

Division to investigate "any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about … puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition,'" or by "promot[ing] … off-label uses of hormones."[8] The memorandum also instructed the Civil Division "to pursue investigations under the False Claims Act of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation," including the prescription of puberty blockers for a purportedly "illegitimate reason" like "gender dysphoria."[9] And the memorandum announced that DOJ would "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners" providing gender-affirming care.[10]

Over the past year, the DOJ has followed the Attorney General's instructions with gusto. On June 11, 2025, the Civil Division issued a memorandum announcing that it would "use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with [the Attorney General's] directives."[11] Soon thereafter, DOJ issued more than 20 administrative subpoenas to medical centers providing gender-affirming care for minors pursuant to 18 U.S.C. § 3486(a)(1)(A)(i)(I), which authorizes subpoenas in aid of investigations of federal healthcare offenses.[12] The press release announcing

---

https://www.justice.gov/ag/media/1402396/dl [https://perma.cc/DHR7-436A].

[8] *Id.* at 4. The Court notes that while "drug manufacturers are prohibited from promoting off-label uses in marketing a drug," the FDCA "does not prohibit doctors from prescribing drugs for off-label uses." *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063, 2026 WL 33398, at *1 (D. Colo. Jan. 5, 2026) (first quoting *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 127 (2d Cir. 2010); and then quoting *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 5 (1st Cir. 2019)). Amicus the American Academy of Pediatrics explains that "off-label prescriptions for drugs are a common feature of modern medical practice and are, at times, the standard of care," including in the context of gender-affirming care for adolescents. Brief of Amicus Curiae American Academy of Pediatrics in Support of Plaintiffs' Motion for a Temporary Restraining Order, Dkt. No. 73, at 3, 6.

[9] *Id.* at 4.

[10] *Id.* at 5.

[11] Memorandum from Assistant Attorney General Brett A. Shumate, "Civil Division Enforcement Priorities," at 2 (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl [https://perma.cc/5LPR-Y74L].

[12] *See In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 569–70 (E.D. Pa. 2025); *see also In*



United States District Court
Northern District of California

the subpoenas stated that "[m]edical professionals and organizations that mutilated children in the service of a warped ideology will be held accountable by [DOJ]."[13] The administrative subpoenas sought, among other records, documents that would "identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy" by the targeted hospitals, as well as documents relating to such patients' "clinical indications" and "diagnoses."[14] Just a few weeks after DOJ served the administrative subpoenas, the White House issued a statement touting the President's success in "end[ing] the barbaric, pseudoscientific practice" of gender-affirming care for minors, listing 20 medical centers that had terminated or significantly curtailed their provision of such care based on executive-branch pressure.[15]

But not every provider of gender-affirming care folded. Many of the hospitals targeted by DOJ's administrative subpoenas moved to quash, arguing that DOJ's sweeping demands for patient records lacked any legitimate investigative purpose. At least eight district courts across the country agreed.[16] While recognizing that DOJ's investigatory authority is broad, several courts

---

*re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, No. CV 1:26-MC-0007, 2026 WL 1392565, at *1 (D.R.I. May 14, 2026); *In re Children's Nat'l Hosp.*, No. 1:25-CV-03780, 2026 WL 160792, at *3 (D. Md. Jan. 21, 2026); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *1; *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 233 (D. Mass. 2025); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1298 (W.D. Wash. 2025); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-MC-00041, 2025 WL 3562151, at *2 (W.D. Wash. Sept. 3, 2025); Declaration of David S. Schumacher, Dkt. No. 31-1 ¶ 2.

[13] *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, U.S. DEP'T OF JUST.: OFF. OF PUB. AFFS. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical [https://perma.cc/P7L9-5MQD].

[14] *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *4 (D. Md. Jan. 21, 2026); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 571; *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *2; *see also In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 238; *QueerDoc, PLLC*, 807 F. Supp. 3d at 1304; *In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *1; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *1.

[15] *President Trump Promised to End Child Sexual Mutilation – and He Delivered*, THE WHITE HOUSE (July 25, 2025), https://www.whitehouse.gov/articles/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/ [https://perma.cc/54DN-4EA9].

[16] *See In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *6–8; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *6–8; *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 236–39; *QueerDoc, PLLC*, 807 F. Supp. 3d at 1302–04; *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 578–87; *In re Subpoena Duces Tecum No. 25-1431-016*, 2025

concluded that DOJ had failed to articulate any basis for investigating the hospitals for violations of federal healthcare laws.[17] Even assuming DOJ had some basis for investigating the hospitals, many courts reasoned, it was "utterly unclear" how such sensitive and identifying patient records related to the hospitals' purportedly unlawful conduct.[18] The lack of connection between DOJ's stated goals and the patient records it demanded led several courts to conclude that DOJ's "true purpose" was "to interfere with [states'] right to protect [gender-affirming care] within [their] borders, to harass and intimidate [hospitals] to stop providing such care, and to dissuade patients from seeking such care."[19] Three courts also determined that disclosure of the sensitive medical records sought by the subpoenas would violate patients' constitutional right to privacy.[20]

Packard, which operates a gender-affirming care clinic, was one of the medical centers that received such an administrative subpoena.[21] Like the administrative subpoenas issued to other hospitals, the "[s]ubpoena issued to Packard included requests for records of all minor patients that received [gender-affirming care]" at the hospital.[22] After receiving the subpoena in July 2025, Packard produced certain non-patient records to DOJ.[23] Packard did not, however, produce any

---

WL 3562151, at *9–13; *In re 2025 UPMC Subpoena*, No. 2:25-MC-01069, 2025 WL 3724705, at *1–3 (W.D. Pa. Dec. 24, 2025); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *3–7.

[17] *In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *6–7; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 237–38; *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *8–9; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *7.

[18] *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *see also QueerDoc, PLLC*, 807 F. Supp. 3d at 1304; *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 578–83; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *4–5.

[19] *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 239; *see also In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *8; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *QueerDoc, PLLC*, 807 F. Supp. 3d at 1303–04; *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *10–12; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *3–7; *In re 2025 UPMC Subpoena*, No. 2:25-MC-01069, 2026 WL 570419, at *2 (W.D. Pa. Mar. 2, 2026).

[20] *See In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *8–10; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8 (D. Md. Jan. 21, 2026); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 588–606.

[21] Schumacher Declaration, Dkt. No. 31-1 ¶ 2.

[22] *Id.*

[23] *Id.* ¶ 3.



United States District Court
Northern District of California

patient records after receiving the subpoena. Instead, Packard spent the next nine months negotiating with DOJ over the possibility of "anonymiz[ing] the patient records" and preparing those anonymized records for production.[24] Before Packard disclosed any anonymized patient records, however, DOJ informed Packard on May 6, 2026 that it was withdrawing the administrative subpoena.[25]

The next day, DOJ served on Packard a grand jury subpoena similar in scope to the withdrawn administrative subpoena.[26] Although it demanded records from an entity located in California, the grand jury subpoena was issued under the seal of the Northern District of Texas.[27] The subpoena requests a wide range of documents from Packard, including records concerning minor patients who received medical care between January 1, 2020 and May 5, 2026 "for the purpose of … affirming [their] asserted gender identity," i.e., gender-affirming care.[28] (The subpoena refers to this care as "Sex-Rejecting Procedures.") Specifically, the grand jury subpoena demands:

> Documents sufficient to identify each patient who underwent Sex-Rejecting Procedures[;] …
>
> [D]ocuments relating to the clinical indications, diagnoses, or assessments that formed the basis for providing Sex-Rejecting Procedures, including the prescribing of puberty blockers and hormones, and all documents relating to the Sex-Rejecting Procedures care provided to each [such] patient … from initial consultation to the most recent treatment provided[; and]
>
> All documents relating to informed consent, patient intake, and parent or guardian authorization for [such] minor patients….[29]

The return date on the subpoena was June 10, 2026.[30]

---

[24] *Id.* ¶ 4.

[25] *Id.* ¶ 6.

[26] *Id.*; Subpoena to Lucile Packard Children's Hospital to Testify Before Grand Jury (May 6, 2026) ("Grand Jury Subpoena"), Dkt. No. 31-2, at 2–8.

[27] Schumacher Declaration, Dkt. No. 31-1 ¶ 6; *see also* Grand Jury Subpoena, Dkt. No. 31-2, at 2.

[28] Grand Jury Subpoena, Dkt. No. 31-2, at 6–8.

[29] *Id.* at 7–8.

[30] *Id.* at 2; Schumacher Declaration, Dkt. No. 31-1 ¶ 6.

Packard is not the only hospital outside Texas that DOJ has targeted from that state. In April, DOJ sought (and received) an order from the Northern District of Texas compelling Rhode Island Hospital to disclose the patient records of transgender minors in response to an administrative subpoena.[31] And on the same day DOJ issued the grand jury subpoena at issue in this case, it issued a nearly identical subpoena to NYU Langone Hospitals in New York.[32] Nothing on the face of the grand jury subpoena served on Packard suggests any nexus to Texas—for example, the requested records are not limited to care provided to patients from Texas. But as the Texas judge presiding over certain matters relating to DOJ's subpoenas has explained, DOJ is "a frequent forum shopper."[33] In the related matters involving subpoenas issued to Rhode Island Hospital and NYU Langone, courts have found that DOJ is engaged "in an obvious effort to shield its recent investigative tactics—previously rejected by every other court to review them—from [those courts'] review, in favor of a distant forum that DOJ deems friendly to its political positions." *In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *1; *see also* Transcript of Teleconference Decision at 8, *Coe v. Blanche*, No. 26-cv-4641 (S.D.N.Y. June 24, 2026), Dkt. No 89 at 11 ("[T]his Court will not blind itself to [the] reality … of DOJ's efforts … to recast discredited civil administrative subpoenas as grand jury subpoenas from a hand-picked faraway jurisdiction in order to minimize judicial review of constitutional infirmities.").

Hoping to challenge the disclosure of their medical records in the district where both they and the records reside, plaintiffs filed suit in this Court on May 27, 2026. Their original complaint asserted claims only against Packard, arguing that Packard was a government actor whose disclosure of patient records would violate plaintiffs' rights under the Fourth and Fifth

---

[31] *See In re Admin. Subpoena 25-1431-032*, No. 4:26-mc-00006 (N.D. Tex. Apr. 30, 2026), Dkt. No. 2.

[32] *See* Subpoena to NYU Langone Hospitals to Testify Before Grand Jury (May 6, 2026), Dkt. No. 1, at 25–36.

[33] THE FEDERALIST SOCIETY, *Opening Remarks from Judge Reed O'Connor [2024 TX Chapters Conference]*, at 7:46–7:53 (YouTube, Oct. 22, 2024), https://www.youtube.com/watch?v=HMTt9pxWBhA [https://perma.cc/GR7A-H6N8]

Amendments. Concurrent with the original complaint, plaintiffs filed a motion for a temporary restraining order (TRO) asking the Court to enjoin Packard from producing their identifying information and medical records to DOJ. The Court denied the motion, concluding on the available record that Packard could not be deemed a government actor.

Plaintiffs then filed an amended complaint, adding DOJ and Acting Attorney General Todd Blanche as defendants. The amended complaint alleges that DOJ is waging a "campaign to end pediatric transgender medical care" that "every major medical association recognizes as necessary care for transgender minors when medically indicated." According to the amended complaint, DOJ's investigations of hospitals and demands for patient data are part and parcel of that broader campaign, serving to intimidate hospitals and minor patients into abandoning lawful gender-affirming care. And plaintiffs contend that DOJ will "us[e] every weapon at its disposal" to achieve its ends. In plaintiffs' view, just as DOJ shifted to grand jury subpoenas when its administrative subpoenas were quashed, DOJ will adopt new tactics should its grand jury subpoenas fail. Plaintiffs claim that DOJ's efforts to procure their sensitive health information violate their rights to informational privacy, bodily autonomy, and equal protection of the laws in violation of the Fifth Amendment; amount to an unreasonable search and seizure in violation of the Fourth Amendment; and chill both their and their medical providers' speech in violation of the First Amendment. Plaintiffs seek relief on behalf of a putative class of all individuals who received gender-affirming care as minors at a healthcare institution in California from January 2020 to May 2026 and on behalf of a putative subclass of individuals who received such care at Packard during the same period.

On the same day they filed their amended complaint, and just hours before the original return date on the grand jury subpoena issued to Packard, plaintiffs filed a renewed motion for a temporary restraining order to enjoin DOJ from requesting, receiving, or otherwise obtaining the sensitive health information demanded by the grand jury subpoena issued to Packard. In support of that motion, plaintiffs sought provisional certification of both the statewide class and Packard subclass.

Given the short time between the filing of the renewed motion for a TRO and the original return date, and because disclosure of the plaintiffs' records could moot their claims, the Court issued an order prohibiting DOJ and Packard from taking further action to enforce or comply with the subpoena in order to preserve the Court's jurisdiction pending a status conference the following day. Twelve hours later, the Court held the status conference and the parties agreed to maintain the status quo pending full briefing and hearing on plaintiffs' renewed TRO motion. The parties subsequently filed a stipulation to that effect. The Court heard argument on the motion on June 24, 2026. At the hearing, the parties expressed their preference that the Court treat plaintiffs' motion for a TRO as one for a preliminary injunction and, to that end, stipulated to maintain the status quo for an additional week.

## ANALYSIS

### I. Plaintiffs' motion to proceed via pseudonym is granted.

Plaintiffs have moved to proceed in this action via pseudonym. Neither Packard nor the DOJ defendants oppose that request. For the reasons explained in the Court's prior order denying plaintiffs' first motion for a temporary restraining order, the Court concludes that this is "the unusual case when nondisclosure of [plaintiffs'] identit[ies] is necessary to protect [them] from harassment," and that plaintiffs' "need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing [plaintiffs'] identit[ies]." Dkt. No. 40 at 8 (first quoting *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067–68 (9th Cir. 2000); and then quoting *Doe v. UNUM Life Ins. Co. of Am.*, 164 F. Supp. 3d 1140, 1144 (N.D. Cal. 2016)). Accordingly, plaintiffs' unopposed motion to proceed via pseudonym is GRANTED.

### II. Plaintiffs' motion for provisional class certification is granted in part and denied in part.

For the purpose of pursuing preliminary relief, plaintiffs ask the Court to provisionally certify the following class and subclass:

> ***Statewide Class:*** All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics,

> for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at a healthcare institution located in the State of California, including Lucile Salter Packard Children's Hospital at Stanford.
>
> ***Packard Subclass:*** All individuals who received any medical treatment for gender dysphoria, including any medical, surgical, pharmaceutical, or clinical intervention that is intended or reasonably expected to suppress, alter, or eliminate endogenous pubertal development, or to modify primary or secondary sex characteristics, for the purpose of aligning with or affirming a minor's asserted gender identity rather than the minor's birth sex, while they were under eighteen years of age, from January 1, 2020, through May 5, 2026, at Lucile Salter Packard Children's Hospital at Stanford.

Under Rule 23, plaintiffs seeking to certify a class must first show that they satisfy four "prerequisites":

> (1) the class is so numerous that joinder of all members is impracticable ["numerosity"];
>
> (2) there are questions of law or fact common to the class ["commonality"];
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"]; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class ["adequacy"].

Fed. R. Civ. P. 23(a). If these prerequisites are satisfied, plaintiffs must also demonstrate that they satisfy at least one requirement of Rule 23(b). *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc). Here, plaintiffs seek provisional certification under Rule 23(b)(2), which applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). In the alternative, plaintiffs seek provisional certification under Rule 23(b)(1)A), which applies where "prosecuting separate actions by … individual class members would create a risk of … inconsistent or varying adjudications … that would establish incompatible standards of conduct for the party opposing the class[.]" Fed. R. Civ. P. 23(b)(1)(A).

"Before it can certify a class, a district court must conduct a 'rigorous analysis' to ensure

that the[se] requirements are satisfied," and "[p]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 862 (9th Cir. 2025) (first quoting *Olean*, 31 F. 4th at 664; and then quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014)). "A district court can certify a provisional class for purposes of a preliminary injunction." *Vasquez Perdomo v. Noem*, 148 F.4th 656, 688 n.15 (9th Cir. 2025) (citation modified). The term "'provisional' … signal[s] that the certification will dissolve if the injunction does" but does "*not* … suggest [the Court] undertook less than a full Rule 23 analysis." *Mercado v. Noem*, No. 25-cv-6568, 2025 WL 2658779, at *17 (S.D.N.Y. Sept. 17, 2025) (citation modified).

For the reasons explained below, plaintiffs have not demonstrated that the proposed statewide class shares common questions of law or fact or that plaintiffs are typical of individuals in the proposed statewide class. But plaintiffs' proposed Packard subclass satisfies the requirements of Rule 23(a) and Rule 23(b)(2). The Court therefore provisionally certifies a class limited to individuals who received care at Packard, to be represented by plaintiffs B.B. and G.G. and plaintiffs' counsel.

### A. Rule 23(a)

#### 1. Numerosity

Plaintiffs have demonstrated that both the proposed statewide class and the Packard subclass are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Determining whether joinder is impracticable "requires examination of the specific facts of each case and imposes no absolute limitations." *General Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). The Ninth Circuit has held that a proposed class is sufficiently numerous where joinder of all class members "would impose very substantial logistical burdens." *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022). And "[n]umerosity is presumed where the plaintiff class contains forty or more members." *Willis v. Koning & Assocs.*, No. 21-CV-00819, 2023 WL 2541327, at *2 (N.D. Cal. Mar. 15, 2023).

The proposed class and subclass are sufficiently numerous. The proposed statewide class

consists of all individuals who received a wide range of gender-affirming medical treatments at any institution in California over a period of more than six years. That number is presumably large in number—indeed, plaintiffs have submitted evidence suggesting that 3,000 minor patients were receiving gender-affirming care from Children's Hospital Los Angeles when that hospital shuttered its clinic for transgender youth in 2025.[34] The proposed Packard subclass similarly consists of all individuals who received gender-affirming care at Packard over a period of more than six years. Though the record does not contain data on the precise number of such patients, Packard's counsel has attested that the records DOJ has demanded for those patients number in the "tens of thousands," suggesting that the proposed subclass significantly exceeds 40 members.[35] Both the proposed class and subclass thus presumptively satisfy the numerosity requirement. *See Willis*, 2023 WL 2541327, at *2.

Even if the proposed class and subclass were not presumptively numerous, joinder of their membership "would impose very substantial logistical burdens." *A.B.*, 30 F.4th at 837. That is because "[t]he potential harm to transgender children if their identities are exposed can be severe." *Int'l Partners for Ethical Care Inc. v. Inslee*, No. 3:23-CV-05736, 2023 WL 7017765, at *1 (W.D. Wash. Oct. 25, 2023). While plaintiffs are willing to risk exposing their identities as transgender youth in order to seek redress for DOJ's allegedly unconstitutional conduct, many other individuals may be unable to do so due to their reasonable fear of retaliation and harassment. *See id.* Courts are "more likely to find impracticability of joinder if fear or retaliation or prejudice could deter individual class members from bringing suit." 5 Moore's Federal Practice § 23.22. And "[w]here, as here, the class seeks only prospective injunctive and declaratory relief, the practical value of joining *each* of the … class members as a formal party is slim to non-existent." *A.B.*, 30 F.4th at 837. The Court concludes that this minimal practical benefit "is plainly outweighed by the substantial logistical burdens that [joinder] would entail." *Id.*

---

[34] Ana B. Ibarra, "Feds drop efforts to get trans patients' records from LA children's hospital," CAL MATTERS (Jan. 24, 2026), https://calmatters.org/health/2026/01/childrens-hospital-transgender-patients-california/ [https://perma.cc/AU9R-L6NH].

[35] Shumacher Declaration, Dkt. No. 31-1 ¶ 7.

Accordingly, the Court finds that both the proposed statewide class and the proposed Packard subclass satisfy Rule 23(a)'s numerosity requirement.

**2. Commonality and Typicality**

"Commonality mandates there be a common question of law or fact among the class members where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1198 (9th Cir. 2024) (citation modified). In other words, commonality exists where "the evidence establishes that a common question is capable of class-wide resolution." *Noohi*, 146 F.4th at 863. "To satisfy commonality, even a single common question is enough." *Small*, 122 F.4th at 1198 (citation modified) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)).

Typicality requires that representative claims be "reasonably coextensive with those of absent class members," but not that they "be substantially identical." *Parsons v. Ryan*, 754 F,3d 657, 685 (9th Cir. 2014). "Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose—and ensures that the interest of the class representative aligns with the interests of the class." *Small*, 122 F.4th at 1201–02. "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* at 1202.

In the context of Rule 23(b)(2) classes, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart*, 564 U.S. at 349 n.2. The Court therefore analyzes them together and finds that plaintiffs have demonstrated commonality and typicality only with respect to the Packard subclass.

**a. Plaintiffs have not established commonality or typicality as to the proposed statewide class.**

Plaintiffs argue that the proposed statewide class shares common questions because "[p]laintiffs and proposed class members are subject to the same challenged course of conduct: DOJ's demand for patient-identifying information … concerning transgender minors and young

United States District Court
Northern District of California

adults who received transgender medical care" in California during the relevant period. In plaintiffs' view, every class member's claim requires the Court to answer questions like "[w]hether DOJ's demand for class members' identifying information … violates the right to informational privacy" and "[w]hether grand jury secrecy, anonymization, or other asserted safeguards are adequate to protect class members' rights."

The problem with this argument is that it assumes, without evidence, that DOJ is seeking to obtain medical records from every provider of gender-affirming care to minors in California. DOJ has certainly stated its intent to investigate many such providers. But the available record suggests that, in practice, DOJ served administrative subpoenas on approximately 20 providers across the country.[36] Plaintiffs do not represent that this number represents all or most providers of gender-affirming care in the United States. And although plaintiffs allege that "at least ten hospitals in California" could be targeted by DOJ, the evidence before the Court identifies only two California hospitals that have received DOJ subpoenas: Packard and Children's Hospital Los Angeles. The latter appears to no longer be under pressure to disclose patient records: After Children's Hospital Los Angeles received an administrative subpoena in 2025, several patients and their families moved to quash, and DOJ entered into a settlement agreement withdrawing its request for any individually identifying patient information from the hospital.[37] Even assuming that other California hospitals have received administrative or grand jury subpoenas from DOJ, there is no way to know whether or not those hospitals have already disclosed the patient records DOJ demands—if they have, any attempt to prevent DOJ's acquisition of their patients' private health information may be too late. *See Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 834 (9th Cir. 2014). For all these reasons, the preliminary record before the Court does not support plaintiffs' assertion that every California hospital providing gender-affirming care to minors is

---

[36] *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, *supra* note 13.

[37] *See* Ana B. Ibarra, "Feds drop efforts to get trans patients' records from LA children's hospital," CAL MATTERS (Jan. 24, 2026), https://calmatters.org/health/2026/01/childrens-hospital-transgender-patients-california/ [https://perma.cc/AU9R-L6NH]; Settlement Agreement, *In re Children's Hospital of Los Angeles Subpoena*, No. 25-CV-11183 (Jan. 22, 2026), Dkt. No. 25-1 at 3–5.

subject to DOJ's demands for identifying patient records. Because that is the sole basis for plaintiffs' argument that common questions undergird the proposed statewide class's claims, they have not established commonality with respect to that proposed class.

Plaintiffs' typicality arguments as to the statewide class fail for similar reasons. Plaintiffs B.B. and G.G. propose to represent the class. B.B. and G.G. sue on behalf of their minor children who received gender-affirming care at Packard.[38] Given the lack of evidence that DOJ is seeking identifying patient records about transgender minors from hospitals other than Packard, the Court cannot conclude that members of the proposed statewide class who received care at other hospitals "have been injured by the same course of conduct" as B.B. and G.G. or that "the action is based on conduct which is not unique to" plaintiffs who received care at Packard. *Small*, 122 F.4th at 1202.[39]

The recent decision of a court in the Southern District of New York in *Coe v. Blanche* is not to the contrary. *See* No. 26-CV-4641, 2026 WL 1815507 (S.D.N.Y. June 24, 2026). As already discussed, on the same day DOJ served a grand jury subpoena on Packard, it served a nearly identical grand jury subpoena on NYU Langone Hospitals in New York City. Based on that subpoena, the patient-plaintiffs in *Coe* filed a putative class action against DOJ, Acting Attorney General Blanche, and Langone to enjoin the disclosure of their private health information to the government. The New York court granted provisional certification of a class of patients who received gender-affirming care at any healthcare institution located in New York City, not just Langone. *See id.* at *1. But in *Coe*, plaintiffs presented evidence that at least one hospital in New York City other than Langone was subject to an active DOJ subpoena demanding transgender minors' identifying patient records. *See* Reply Memorandum in Support of Plaintiffs' Motion for Temporary Restraining Order and Provisional Class Certification at 2, *Coe*, No. 26-CV-4641 (citing news reporting confirming "that Mount Sinai Health System received a subpoena"). And

---

[38] Declaration of B.B., Dkt. No. 45-7 ¶¶ 1–2; Declaration of G.G., Dkt. No. 45-8 ¶¶ 1–2.

[39] Of course, to the extent plaintiffs subsequently procure evidence that DOJ is seeking the medical records of minors who received care at institutions other than Packard, they may seek relief on their behalf at that time.

the proposed class representatives included patients who received care at that other hospital in addition to patients at Langone. *See* Memorandum of Law in Support of Plaintiffs' Motion for Provisional Class Certification at 13, *Coe*, No. 26-CV-4641. In other words, the record in *Coe* supported a finding that DOJ's challenged course of conduct would injure putative class members at multiple hospitals in New York City and that the proposed class representatives' interests aligned with putative class members regardless of where those members received gender-affirming care. The record here does not support a similar determination.

**b. Plaintiffs have established commonality and typicality as to the proposed Packard subclass.**

Unlike with the California class, plaintiffs have demonstrated that members of the proposed Packard subclass share common questions and that B.B. and G.G.'s claims are typical of the subclass's claims. DOJ has not argued otherwise.

As to typicality, Packard has confirmed that DOJ is demanding patient data for every member of the proposed subclass pursuant to a grand jury subpoena and that DOJ previously did so through an administrative subpoena.[40] All members of the proposed subclass, including B.B. and G.G.'s children, thus face injury as "a result of a course of conduct that is not unique to any of them," that is, DOJ's demand for Packard's patient records. *Parsons*, 754 F.3d at 685. That shared injury "follows from the course of conduct at the center of the class claims." *Id.* B.B. and G.G.'s claims are therefore typical of the proposed Packard subclass's claims.

As to commonality, the claims of each of the proposed subclass members turn on a common question concerning the nature and strength of DOJ's interest in procuring subclass members' private health information. *See Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004) (informational privacy), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *United States v. Virginia*, 518 U.S. 515, 533 (1996) (equal protection); *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014) (substantive due

[40] *See* Shumacher Declaration, Dkt. No. 31-1 ¶¶ 2, 6; *see also* Grand Jury Subpoena, Dkt. No. 31-2, at 7–8.

process); *United States v. Alverez-Tejeda*, 491 F.3d 1013, 1016 (9th Cir. 2007) (unreasonable search and seizure); *cf. Conant v. Walters*, 309 F.3d 629, 639 (9th Cir. 2002) (analyzing the government's motive in action challenging its investigation of physicians for communicating certain messages to patients). The record strongly suggests that DOJ's interest in each proposed subclass member's information is exactly the same. DOJ did not differentiate among Packard patients when twice demanding their data in its subpoenas, nor has it attempted to do so before this Court. And at least as to the informational-privacy claim, many of the factors bearing on the strength of DOJ's interest in the information—like "the type of information requested" and "the adequacy of safeguards to prevent [subsequent] unauthorized disclosure" by DOJ, *Tucson Woman's Clinic*, 379 F.3d at 551—cannot logically vary across subclass members.

The proposed Packard subclass therefore independently satisfies the requirements of Rule 23(a)(2) and (3).

**3. Adequacy**

Plaintiffs have established that they "will fairly and adequately protect the interests of the" proposed Packard subclass. Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry is addressed by answering two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? If either answer is no, the representative is inadequate." *Small*, 122 F.4th at 1202 (citation modified). To satisfy these criteria, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).

As to the proposed class counsel, plaintiffs assert that counsel has no conflicts with the interests of the class and is competent to vigorously prosecute the action on behalf of the class.[41]

[41] *See* Declaration of Caleb Hayes-Deats, Dkt. No. 45-2 ¶¶ 4–18 (describing qualifications and commitment of Lowell & Associates PLLC); Declaration of Josh Rovenger, Dkt. No. 45-3 ¶¶ 2–17 (describing qualifications and commitment of GLBTQ Legal Advocates & Defenders); Declaration of Kara Janssen, Dkt. No. 45-4 ¶¶ 2–7 (describing qualifications and commitment of Rosen Bien Galvan & Grunfeld LLP); Declaration of Shannon P. Minter, Dkt. No. 45-5 ¶¶ 2–27 (describing qualifications and commitment of the National Center for LGBTQ Rights).

DOJ does not argue otherwise.

As to the proposed class representatives, plaintiffs B.B. and G.G. assert claims in this action on behalf of their minor children Z.B. and Z.G.[42] Both B.B. and G.G. attested that their children received gender-affirming care at Packard during the relevant period, i.e., that their children are members of the Packard subclass.[43] B.B. and G.G. also represent that their interests in preventing Packard's disclosure of sensitive medical information without patients' consent fully aligns with the interests of the subclass and that they will vigorously prosecute this action on behalf of the class.[44]

DOJ argues that B.B. and G.G. are inadequate class representatives because they are proceeding pseudonymously. To be sure, some courts in this circuit have suggested that "where … plaintiff[s] seek[] to assert class damages claims … class members will … have a right to know the identity of their representative[s] in th[e] litigation." *Doe v. NFL Enters., LLC*, No. 17-CV-00496, 2017 WL 697420, at *2 (N.D. Cal. Feb. 22, 2017); *see also I.L. v. Six Flags Ent. Corp.*, No. 23-CV-01769, 2025 WL 2300009, at *5 (E.D. Cal. Aug. 8, 2025). That makes sense: In damages actions, "[p]utative class members have an interest in … assess[ing] whether the representatives adequately represent them and whether they wish to participate in the action[.]" *Barbara v. Trump*, 790 F. Supp. 3d 80, 96 (D.N.H. 2025) (citation modified)), *aff'd*, No. 25-365, 2026 WL 1870543 (U.S. June 30, 2026). But in a Rule 23(b)(2) class seeking only prospective relief, "the putative class members have no way to opt in or out of the class, and thus less need for information about class representatives." *Id.*

Further, where pseudonymous plaintiffs "seek declaratory and injunctive relief applicable to the entire class," rather than "[i]ndividual damages …, there is little, if any, possibility of conflicting interests between [the pseudonymous plaintiffs] and members of the class … that would preclude [the pseudonymous plaintiffs] from making decisions that benefit the entire class."

---

[42] B.B. Decl., Dkt. No. 45-7 ¶ 1; G.G. Decl., Dkt. No. 45-8 ¶ 1.

[43] B.B. Decl., Dkt. No. 45-7 ¶ 2; G.G. Decl., Dkt. No. 45-8 ¶ 2.

[44] B.B. Decl., Dkt. No. 45-7 ¶ 16; G.G. Decl., Dkt. No. 45-8 ¶ 17.

*Does 1-10 v. Univ. of Washington*, 326 F.R.D. 669, 682–83 (W.D. Wash. 2018); *see also Barbara*, 790 F. Supp. 3d at 96. DOJ attempts to manufacture a conflict here by hypothesizing that some members of the Packard subclass might not oppose DOJ's collection of their identifying medical records. This is no conflict at all—the relief plaintiffs seek would not prevent individual class members from disclosing their health information to DOJ or authorizing Packard to do the same.

Nor would pseudonymous representation vitiate the public interest, as "[i]n putative class actions raising constitutional challenges, the public interest is not being able to identify any one [p]laintiff, but in being able to follow the case to determine how the constitutional issues are resolved." *Doe v. City of Apple Valley*, No. 20-CV-499, 2020 WL 1061442, at *3 (D. Minn. Mar. 5, 2020). By contrast, "a rule that class representatives must be publicly identified"—even where the Court has determined that pseudonymity is otherwise warranted based on stigma and potential harassment—"would likely discourage individuals from stepping forward and seeking redress for their injury. That is antithetical to the purpose of the class action" and contrary to the public interest. *Id.* Unsurprisingly, other courts in this circuit have certified classes represented by pseudonymous plaintiffs under Rule 23(b)(2). *See, e.g.*, *Doe v. Mindgeek USA Inc.*, 702 F. Supp. 3d 937, 954 (C.D. Cal. 2023); *Does 1-10*, 326 F.R.D. at 685.

The Court concludes that B.B. and G.G. are adequate representatives and that plaintiffs' counsel is adequate counsel for the proposed Packard subclass. Accordingly, the proposed Packard class and its proposed representatives satisfy the Rule 23(a) prerequisites.

**B. Rule 23(b)(2)**

Plaintiffs also satisfy the requirements of Rule 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360; *see also id.* ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.") (citation modified). "These requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons*, 754 F.3d at 688. That is the case here. The

provisional Packard class seeks to enjoin DOJ from taking further action to request or obtain Packard patient data. DOJ has not drawn any distinctions between the patients whose medical records it seeks, and all of those records have been subject to the same administrative and grand jury subpoenas. Nor has DOJ otherwise attempted to argue that Packard patients lack a shared injury. It contends only that certification of the proposed statewide class would be improper because a statewide remedy would be "readily divisible," as patients of a particular hospital "would get nothing" from an order prohibiting DOJ's pursuit of patient data from other hospitals. That argument obviously does not apply to the proposed Packard subclass, every member of which received gender-affirming care at the same institution.

Accordingly, plaintiffs have established that they satisfy all the prerequisites of Rule 23(a) and the requirements of Rule 23(b)(2) with respect to the Packard subclass. The Court provisionally certifies the Packard subclass (the "provisional class") for the purposes of plaintiffs' motion for a preliminary injunction. Plaintiffs B.B. and G.G. shall represent the provisional class. Because the Court certifies the provisional class under Rule 23(b)(2), it need not address plaintiffs' alternative request for certification under Rule 23(b)(1)(A).

**III. Plaintiffs' motion for a preliminary injunction is granted in part and denied in part.**

Plaintiffs request a temporary restraining order that would prohibit DOJ from requesting, receiving, or otherwise obtaining certain identifying and private patient information from California hospitals that provided gender-affirming care to minors within the past six years. The standard for issuing a temporary restraining order is largely identical to the standard for issuing a preliminary injunction. *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017). Plaintiffs seeking either form of relief must establish that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a [temporary restraining order or] preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor and the other two *Winter* factors are

United States District Court
Northern District of California

satisfied.'" *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)). "Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—merge." *Youth 71Five Ministries v. Williams*, 160 F.4th 964, 977 (9th Cir. 2025) (citation modified).

Although the substantive standards for both motions are similar, the timeframe for a temporary restraining order is different. While a preliminary injunction remains in effect pending final resolution of the litigation, "a TRO 'should be restricted to ... preserving the status quo and preventing irreparable harm just so long as is necessary to hold a [preliminary injunction] hearing and no longer.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974)). And "temporary restraining orders, in contrast to preliminary injunctions, are not appealable." *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 804 (9th Cir. 2002).

Although plaintiffs originally moved for a temporary restraining order, defendants received notice and an opportunity to respond to the motion, both in writing and orally at the hearing. All parties have therefore agreed that the Court should treat plaintiffs' motion as one for a preliminary injunction. The Court agrees and so converts the motion.

Because the Court denies plaintiffs' motion for provisional certification of the proposed statewide class, the Court denies plaintiffs' request for statewide injunctive relief. *See Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, 485 F. Supp. 3d 1168, 1176 (N.D. Cal. 2020), *aff'd sub nom. Yeomans v. World Fin. Grp. Ins. Agency, LLC.*, No. 20-16937, 2021 WL 5356537 (9th Cir. Nov. 17, 2021). But because plaintiffs have satisfied each of the *Winter* factors with respect to the provisional Packard class, the Court grants preliminary injunctive relief to that provisional class.

### A. Plaintiffs have raised at least serious questions as to the ultimate success of their informational-privacy claim under the Fifth Amendment.

Although plaintiffs' complaint asserts several constitutional claims against all defendants, their motion for a preliminary injunction seeks relief only from DOJ and Acting Attorney General Blanche based on their informational-privacy claim under the Fifth Amendment and free-speech

claim under the First Amendment. DOJ contests both the procedural propriety of this action and the merits of plaintiffs' claims. On the available record, the Court finds that plaintiffs have raised at least "serious questions" as to DOJ's argument that their chosen procedural vehicle is improper and have demonstrated a likelihood of success on their informational-privacy claim. The Court therefore need not address plaintiffs' First Amendment claim.

**1. Plaintiffs have shown serious questions, and possibly a likelihood of success, as to the availability of the relief they seek.**

DOJ contends that, regardless of the merits of plaintiffs' constitutional claims, their assertion of those claims here is improper for four reasons.

***First,*** DOJ insists that sovereign immunity bars plaintiffs' claims. But in § 702 of the Administrative Procedure Act, Congress expressly waived sovereign immunity as to any "action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer … acted … in an official capacity or under color of legal authority." 5 U.S.C. § 702. This waiver is "not limited to suits involving an 'agency action' as defined under the APA." *Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019). The waiver squarely applies to plaintiffs' claims for injunctive relief against DOJ (an "agency") and Acting Attorney General Blanche (an "officer"). *See* 5 U.S.C. § 701(b)(1) (defining "agency" as "each authority of the Government of the United States"); *see* 5 U.S.C. § 2104 (defining "officer" to include any individual "engaged in the performance of a Federal function under authority of law or an Executive act").

***Second,*** DOJ argues that plaintiffs have no private right of action to assert their constitutional claims. It is true that plaintiffs may lack a *statutory* cause of action, but that is not dispositive. The Supreme Court "ha[s] long held that federal courts may in some circumstances grant injunctive relief" to prevent "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) (citing *American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 110 (1902)). "The ability to sue to enjoin unconstitutional actions by … federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* (citation modified). Plaintiffs thus seek the sort of "equitable relief that is traditionally available to enforce federal

United States District Court
Northern District of California

law." *Id.* at 329.

***Third,*** DOJ contends that any equitable cause of action that might have been available to plaintiffs has been displaced by Federal Rule of Criminal Procedure 17, which governs subpoenas in federal criminal actions. This issue is closer than the first two. As the Supreme Court explained in *Armstrong*, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Id.* at 327. Because "the Federal Rules have the force of statute," *Hilao v. Est. of Marcos*, 95 F.3d 848, 852 (9th Cir. 1996), it follows that a federal rule of criminal procedure could displace an equitable cause of action. But a traditional equitable remedy remains available unless "Congress has demonstrated an 'intent to foreclose' that form of relief." There is good reason to doubt that Rule 17 precludes the equitable relief plaintiffs seek.

Rule 17 provides that a subpoena in the federal criminal context, whether issued as part of a grand jury investigation or after a prosecution is underway, "must state the court's name" and "include the seal of the court." Fed. R. Crim. P. 17(a). The rule also creates a procedure for challenging a subpoena: "On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). So the rule contemplates that the court hearing a motion to quash will be the same court whose name and seal appear on the subpoena—that is, the court for the district from which the subpoena issued.

It is quite likely that Rule 17 would preclude plaintiffs from filing a motion to quash a grand jury subpoena issued by DOJ in a district other than the one from which the subpoena issued. In interpreting a similar (but since-altered) provision in Rule 17's civil analog, the Ninth Circuit held that only "the issuing court … has the authority to consider motions to quash or modify" and affirmed a district court's decision denying review of a motion to quash on that basis. *S.E.C. v. CMKM Diamonds, Inc.*, 656 F.3d 829, 832 (9th Cir. 2011).

But plaintiffs do not seek to quash a particular grand jury subpoena. Rather, plaintiffs challenge DOJ's broader campaign to procure provisional class members' private health information, which began a year ago when DOJ issued an administrative subpoena to Packard. Both plaintiffs' amended complaint and their motion for a preliminary injunction ask the Court to

enjoin DOJ from "obtaining" that information by any means. Because the grand jury subpoena is DOJ's latest gambit to obtain plaintiffs' information, plaintiffs' requested relief would of course impact DOJ's ability to enforce the subpoena. As plaintiffs' counsel explained at the hearing, however, their requested remedy would not invalidate the subpoena itself, which would remain in place. Nor is plaintiffs' requested remedy a mere proxy for a motion to quash. Given DOJ's persistence in pursuing transgender minors' patient data, there is little reason to think that the grand jury subpoena will be DOJ's last such effort. A motion to quash could not enjoin those new efforts; equitable relief can. So plaintiffs seek equitable relief to avoid playing "a game of whack-a-mole" in which they must constantly uncover and counter DOJ's ever-shifting tactics. Teleconference Decision at 7, *Coe*, No. 26-cv-4641, Dkt. No 89 at 10.

The question, then, is whether Rule 17's quashal provision embodies an intent to foreclose equitable remedies in one district that would incidentally prevent DOJ's enforcement of a grand jury subpoena in another district. A conclusive answer must await fuller briefing on a non-expedited schedule. At this early stage, however, the Court concludes that Rule 17 likely does not foreclose such remedies.

*Armstrong* guides the Court's analysis. There, the Supreme Court addressed whether certain provisions of the Medicaid Act foreclosed equitable relief seeking to compel Idaho's compliance with § 30(A) of that statute. *See* 575 U.S. at 323–24, 327–29. The Supreme Court reasoned that "[t]wo aspects of § 30(A) establish Congress's intent to foreclose equitable relief." *Id.* at 328 (citation modified). "First, the sole remedy Congress provided for a State's failure to comply with Medicaid's requirements … is the withholding of Medicaid funds by the Secretary of Health and Human Services." *Id.* (citing 42 U.S.C. § 1396c). The *Armstrong* Court cautioned, however, that "[t]he provision for the … enforcement [of Medicaid's requirements] by withholding funds might not, *by itself*, preclude the availability of equitable relief." 575 U.S. at 328. Instead, equitable relief was unavailable because the statute contained another indicum of Congress's intent to foreclose such relief: "the judicially unadministrable nature of § 30(A)'s text," which is broad, unspecific, and complex. "Explicitly conferring enforcement of this judgment-laden standard upon the Secretary alone establishes … that Congress wanted to make

United States District Court
Northern District of California

the agency remedy that it provided exclusive[.]" *Id.* (citation modified); *see also id.* at 329 ("The sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy, … shows that the Medicaid Act precludes private enforcement of § 30(A) in the courts.").

Like the Medicaid Act in *Armstrong*, Rule 17 provides only one remedy for an unlawful subpoena: a motion to quash or modify in the court for the district from which the subpoena issued. *See* Fed. R. Crim. P 17(c)(2). But Rule 17's remedy is far less tailored to a specific violation of federal law than the statutory remedy at issue in *Armstrong*. That remedy (the withholding Medicaid funds) was directed to a discrete statutory violation: a state's failure to comply with the requirements for state medical-assistance plans under 42 U.S.C. § 1396a. *See* 575 U.S. at 328; 42 U.S.C. § 1396c. It was this "express provision of one method of enforcing a [particular] substantive rule" that, the Court reasoned, "suggests that Congress intended to preclude others." *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). Rule 17, by contrast, provides a broad mechanism to challenge any federal criminal subpoena—whether issued in aid of a grand jury investigation or trial—as "unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). Such challenges may be based on, among other reasons, a subpoena's indefiniteness or lack of relevance, the burdensome nature of compliance, statutory or common-law privileges, or the Constitution. *See United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991); *Branzburg v. Hayes*, 408 U.S. 665, 688, 708 (1972). Because the remedy provided by Rule 17 lacks a close relationship to any particular substantive rule of federal law, it is less suggestive of a congressional intent to preclude equitable relief for violations thereof than the narrowly tailored remedy considered in *Armstrong*.

Even if Rule 17's quashal mechanism were analogous to the Medicaid Act's remedial provision, it likely would "not, *by itself*, preclude the availability of equitable relief" here. *Armstrong*, 575 U.S. at 328; *see also Sierra Club*, 929 F.3d at 699 (explaining that the APA's provision of a "general mechanism by which to challenge final agency action" does not foreclose direct constitutional claims challenging the same agency action). That is because, unlike the Medicaid Act, Rule 17 contains no other indicia of an intent to foreclose constitutional claims for

equitable relief that would incidentally affect enforcement of a subpoena. DOJ points to a provision in Rule 6 requiring grand jury secrecy. *See* Fed. R. Crim. P. 6(e). Because that provision limits DOJ's ability to disclose details about a grand jury investigation, DOJ argues that reviewing the legitimacy of its reasons for issuing a grand jury subpoena in another district is impractical and suggests an intent to foreclose such review. That may be a plausible interpretation, but it is undercut by an exception allowing DOJ to petition to disclose "a grand-jury matter … in connection with a judicial proceeding[.]" Fed. R. Crim. P. 6(e)(3)(E)(i). Though such a petition "must be filed in the district where the grand jury convened," the rule expressly contemplates that it may "arise[] out of a judicial proceeding in another district." Fed. R. Crim. P. 6(e)(3)(F), (G). Rule 6 thus acknowledges that a court in one district may have good cause to review at least some matters related to grand jury proceedings in another district. Absent some other indicia of an intent to foreclose equitable remedies affecting enforcement of criminal subpoenas, the Court cannot conclude that Rule 17 precludes plaintiffs' claims.

This conclusion is bolstered by *N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 165–67 (2d Cir. 2006). In *Gonzales*, the Second Circuit held that a plaintiff could use a declaratory action in one district to collaterally challenge DOJ's attempt to obtain the plaintiff's confidential information by issuing a grand jury subpoena to a third party under the seal of another district. *See id.* at 167. Critical to the Second Circuit's reasoning was that a motion to quash under Rule 17 might not afford the plaintiff complete relief, whether because the subpoenas had yet to issue or because the recipients had already complied. *See id.* at 167. While not directly on point, *Gonzales* at least stands for the proposition that Rule 17 does not foreclose all other relief affecting DOJ's enforcement of a grand jury subpoena where quashal is unlikely to fully remedy the alleged constitutional harms. That is the case here. As discussed above, and as the court in *Coe* explained, "[t]he filing of a Rule 17(c) motion to quash the [grand jury] subpoena in the Northern District of Texas would not have any effect on other grand jury or civil administrative subpoenas seeking the same information from [Packard] … [T]he government may simply switch their strategy and go after plaintiffs' private information under the guise of a different investigation." Transcript of Teleconference Decision at 17, *Coe*, No. 26-cv-4641, Dkt. No 89 at 20.

The Court does not suggest that this issue is open and shut, nor need it be at this stage. For present purposes, it suffices that plaintiffs have raised serious questions as to the availability of equitable relief that overlaps with (but does not duplicate) the relief available under Rule 17.

***Fourth,*** DOJ argues that even if the Court has discretion to review plaintiffs' claims for equitable relief, it should decline to do so based on comity and separation-of-powers concerns. Neither rationale is convincing.

"The purpose of the comity principle" is "to avoid placing an unnecessary burden on the federal judiciary" (i.e., to avoid duplicative litigation) "and to avoid the embarrassment of conflicting judgments." *Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979), *overruled in part on other grounds by Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016). Plaintiffs' claims are not duplicative of any potential proceedings in the Northern District of Texas because they challenge a broader campaign of conduct than could be challenged through a motion to quash in that district. Nor will plaintiffs' requested relief result in conflicting judgments or "enjoin[] an action underway in a sister court." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Payless Shoesource, Inc.*, No. 11-CV-1892, 2012 WL 3277222, at *8 (N.D. Cal. Aug. 9, 2012). A grand jury subpoena issues without judicial review, *see* Fed. R. Crim. P. 17(a), and nothing in the record suggests that any court in Texas has reviewed or approved the scope of the grand jury subpoena issued to Packard. In any event, plaintiffs' requested injunction does not invalidate, quash, or otherwise operate on a particular subpoena—it enjoins DOJ from acting to obtain plaintiffs' information by whatever means.

DOJ also argues that granting injunctive relief "would raise serious separation-of-powers concerns because it would effectively restrain a lawful Executive Branch criminal investigation through collateral civil process." But plaintiffs' requested injunction does not terminate DOJ's criminal investigation in the Northern District of Texas. It narrowly prevents DOJ from obtaining private health information that, as the Court explains below, has no apparent relevance to any crime indictable in Texas. DOJ remains otherwise free to proceed with its investigation, including by obtaining other records from Packard that do not disclose individual patients' private information. Nor does the injunction restrain "lawful" conduct. The very reason for the injunction



United States District Court
Northern District of California

is that DOJ's challenged conduct is likely *not* lawful. It is well settled that federal courts may exercise their equitable authority to enjoin likely unconstitutional actions by executive-branch actors. *See In re Clean Water Act Rulemaking*, 60 F.4th 583, 594 (9th Cir. 2023).

DOJ's protestations about comity and separation-of-powers principles are unavailing for an additional reason: Any risk of conflicting court orders or interference with criminal investigations has been manufactured by DOJ itself. DOJ issued an administrative subpoena to Packard in July 2025, and that subpoena would be subject to challenge by plaintiffs in this district. The administrative subpoena was never quashed. Instead, Packard produced responsive non-patient records and, by May 2026, was actively "explor[ing] the possibility" of producing "anonymized patient records," which "DOJ had indicated it would accept … in the first instance."[45] Despite being poised to get everything it could reasonably need, DOJ abruptly withdrew the administrative subpoena on May 6, 2026, and replaced it the very next day with a grand jury subpoena of nearly identical scope, issued under the seal of the Northern District of Texas.[46] That tactical shift came in the wake of a series of court losses in which DOJ's administrative subpoenas demanding other hospitals' patient records were quashed for lack of a legitimate purpose.[47] The unavoidable conclusion is that DOJ issued its grand jury subpoena to avoid another loss and force Packard and its patients to pursue any challenge to DOJ's demands in a forum that DOJ deems friendlier. This is hardly DOJ's first such ploy. *See In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *1; Transcript of Teleconference Decision at 8, *Coe*, No. 26-cv-4641, Dkt. No 89 at 11. DOJ cannot reasonably invoke comity and the separation of powers as cover for its forum shopping. Plaintiffs received care in this district from a hospital in this district, and unless Rule 17 forbids it, they may seek protection for the resulting medical records in this district.

In sum, most of DOJ's procedural arguments likely fail. As to the question of whether Rule

---

[45] Schumacher Decl., Dkt. No. 31-1, ¶¶ 2–4.

[46] *Id.* ¶ 6.

[47] *See supra* note 16.

17 forecloses equitable relief here, plaintiffs have at least raised serious questions. The Court therefore turns to the merits.

**2. Plaintiffs are likely to succeed on the merits of their informational-privacy claim.**

Plaintiffs claim that DOJ's attempts to obtain their private health information violates their constitutional right to informational privacy. The Ninth Circuit has long "recognized [this] right" as "stemming from an individual's interest in avoiding disclosure of personal matters." *Doe v. Bonta*, 101 F.4th 633, 637 (9th Cir. 2024) (citation modified); *see also Tucson Woman's Clinic*, 379 F.3d at 551–52. And the Supreme Court has for decades assumed, without conclusively deciding, that such a right exists. *See Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 147 (2011) (citing *Whalen v. Rose*, 429 U.S. 589, 599 (1977)). As asserted against federal actors, the right arises under the Fifth Amendment. *See id.* at 147 n.10 (noting that the right is rooted in "due process").

Not all compelled disclosures implicate the right to informational privacy—only "certain, highly sensitive information" triggers constitutional protections. *Doe v. Garland*, 17 F.4th 941, 947 (9th Cir. 2021). But DOJ does not dispute that the information at issue here is highly sensitive. That is for good reason: The information includes detailed and identifying medical records as well as social security numbers, two categories of information that the Ninth Circuit has suggested implicate informational-privacy rights. *See Tucson Woman's Clinic*, 379 F.3d at 552–53; *Doe v. Bonta*, 101 F.4th at 637–38; *In re Crawford*, 194 F.3d 954, 960 (9th Cir. 1999).

That plaintiffs have a constitutional interest in preventing disclosure of the information does not end the inquiry. The right to informational privacy "is not absolute; rather, it is a conditional right which may be infringed upon a showing of proper governmental interest." *Doe v. Bonta*, 975 F.3d at 768 (quoting *Crawford*, 194 F.3d at 958). "[T]o determine whether the governmental interest in obtaining information outweighs the individual's privacy interest," the Court must balance five factors:

> (1) the type of information requested, (2) the potential for harm in any subsequent non-consensual disclosure, (3) the adequacy of safeguards to prevent unauthorized disclosure, (4) the degree of need

> for access, and (5) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Tucson Woman's Clinic*, 379 F.3d at 551. Taken together, these factors show that the provisional class's privacy interests likely outweigh DOJ's interest in obtaining class members' sensitive health information.

**a. The Type of Information Requested**

The type of information requested by DOJ is highly sensitive because it includes both personally identifying information about minor patients (e.g., names, dates of birth, and social-security numbers) and detailed information about their medical histories (e.g., the gender-affirming care they received, the clinical assessments and diagnoses underlying that care, and their consent to or parental authorization for such care). *See id.* at 552–553 (reasoning that "broad" requests for "patient identifying information such as names and full medical histories" generated a heightened privacy interest). Such detailed medical information is all the more sensitive because it identifies provisional class members as having received care that is subject to intense political controversy, that the federal government has professed a desire to "end,"[48] and that state authorities in Texas have suggested could from the basis for child-abuse prosecutions against patients' parents.[49]

DOJ suggests that provisional class members have no reasonable expectation that their personal health information will remain private because Packard's privacy notice states that such information may be disclosed to law enforcement and HIPAA's implementing regulations authorize such disclosures "[i]n compliance with … [a] grand jury subpoena." *See* 45 C.F.R. § 164.512(f)(1)(ii). But the privacy notice indicates that such disclosures will occur only "when certain conditions are met,"[50] and the cited regulation provides that disclosure will be "limited by

[48] Exec. Order No. 14187, 90 Fed. Reg. 8771, 8771 (2025).

[49] *AG Paxton Declares So-Called Sex-Change Procedures on Children and Prescription of Puberty Blockers to be "Child Abuse" Under Texas Law*, ATT'Y GEN. OF TEX (Feb. 21, 2022), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-declares-so-called-sex-change-procedures-children-and-prescription-puberty-blockers-be [https://perma.cc/Z67Z-A5RR].

[50] Stanford Medicine Notice of Privacy Practices, Dkt. No. 79-1, at 7.



United States District Court
Northern District of California

the relevant requirements" for a grand jury subpoena. *See id.* Thus, they suggest that patients' personal health information will not be disclosed absent a showing of possible relevance to the purported law-enforcement purpose and an attendant government interest in the information. A reasonable patient reading this language could very well maintain an expectation of privacy where their personal health information is minimally relevant to DOJ's professed law-enforcement purpose. In fact, at least three parent-plaintiffs *did* maintain such an expectation, attesting that they "never consented to [Packard] disclosing [their children's] patient-identifying medical records to the government."[51]

DOJ next argues that whatever constitutional interest provisional class members may have in their sensitive health information evaporates in the face of a grand jury subpoena because "[t]here is no general right to privacy before the grand jury." *In re Grand Jury Proceedings*, 801 F.2d 1164, 1169 (9th Cir. 1986); *see also United States v. Calandra*, 414 U.S. 338, 353 (1974) ("Ordinarily, of course, a witness has no right of privacy before the grand jury."). But plaintiffs do not assert a "general right of privacy." They invoke a narrow due-process right to the privacy of information of a particularly sensitive and intimate nature—here, identifying information coupled with details of their medical history, including their receipt of politically controversial care.

While an individual subject to a grand jury subpoena "may not decline to answer on the grounds that his responses might prove embarrassing or result in an unwelcome disclosure of his personal affairs," the Supreme Court has acknowledged that "some recognized privilege[s] of confidentiality" under the Constitution apply in the grand jury context. *Calandra*, 414 U.S. at 353. In *Calandra*, the Supreme Court suggested that a grand jury subpoena that effected an "independent governmental invasion of one's … papers[] or effects," rather than "the usual abridgment of personal privacy common to all grand jury questioning," might contravene the Fourth Amendment. *Id.* at 354. That was not the case in *Calandra* because the subpoena at issue asked questions based on a prior unreasonable search but did not itself demand documents without probable cause. The subpoena therefore "work[ed] no new Fourth Amendment wrong." *Id.* By

[51] G.G. Decl., Dkt. No. 45-8 ¶ 7; B.B. Decl., Dkt. No. 45-7 ¶ 7; Declaration of A.G., Dkt. No. 45-6 ¶ 5.

contrast, DOJ's demand for provisional class members' sensitive health information would effect a new and distinct harm to class members' constitutionally protected privacy interests. DOJ's use of a grand jury subpoena does not obviate the extreme sensitivity of that information or the provisional class's privacy interests therein. *Cf. Hale v. Henkel*, 201 U.S. 43, 76 (1906) (holding that a grand jury subpoena contravened the Fourth Amendment because its demand for documents was "far too sweeping in its terms to be regarded as reasonable"), *overruled on other grounds by Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52 (1964)).

**b. The Potential Harm from, and Adequacy of Safeguards to Prevent, Unauthorized Disclosure**

Plaintiffs have also established potential harm from Packard's non-consensual disclosure of their private health information to DOJ. As DOJ notes, cases considering informational-privacy claims usually focus on the risk that government actors will misuse or publicly disclose sensitive information after the government has obtained it, rather than harm stemming from the government's initial acquisition of the information. *See, e.g.*, *Endy v. County of Los Angeles*, 975 F.3d 757, 769 (9th Cir. 2020). Still, the right to informational privacy "applies both when an individual chooses not to disclose highly sensitive information to the government and when an individual seeks assurance that such information will not be made public." *Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 789–90 (9th Cir. 2002). "Even if a law adequately protects against *public* disclosure of a patient's private information, it may still violate informational privacy rights if an unbounded, large number of government employees have access to the information." *Tucson Woman's Clinic*, 379 F.3d at 551–52.

DOJ contends that there is no realistic potential for harm here because the requirement of grand jury secrecy will prevent the widespread dissemination of provisional class members' sensitive health information within the government. Even assuming that DOJ will not use means other than a grand jury subpoena to seek class members' information, the Court disagrees that the requirements of grand jury secrecy eliminate the risk of harm for two reasons.

First, the DOJ attorneys who assuredly will have access to provisional class members' information are those investigating Packard and other providers of gender-affirming care. In other

words, the information will be accessible to the drivers of what courts around the country have found to be a bad-faith campaign to intimidate hospitals into halting the lawful provision of gender-affirming care. *See In re Admin. Subpoena 25-1431-032 to Rhode Island Hosp.*, 2026 WL 1392565, at *8; *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 238–39; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *QueerDoc, PLLC*, 807 F. Supp. 3d at 1304; *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *12; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *7; *In re 2025 UPMC Subpoena*, 2026 WL 570419, at *2. It is of little solace to transgender minors that the only officials with access to their medical records are those working to terminate gender-affirming care based on clear hostility to "transgenderism" (i.e., the existence of transgender people).[52] And regardless of identity or animus, the disclosure of children's private health information to officials who expressly intend to deprive them of medical care that their families, doctors, and the California legislature deem necessary and appropriate is an obvious harm.

Second, Rule 6(e) expressly authorizes disclosure of grand jury materials to "any" state official whom DOJ unilaterally deems "necessary to assist in performing [DOJ]'s duty to enforce federal criminal law." Fed. R. Crim. P. 6(e)(3)(A)(ii). So grand jury secrecy would not prevent disclosure of provisional class members' health information to a large number of Texas officials. In her memorandum instructing DOJ to begin investigating providers of gender-affirming care, then-Attorney General Bondi stated that she would "partner with state attorneys general," and DOJ has since collaborated with the Texas Attorney General in at least one criminal investigation of a hospital providing gender-affirming care,[53] making such disclosure more likely. The provision of provisional class members' health information to Texas officials would not be merely

---

[52] Memorandum from Attorney General Pamela Bondi, *supra* note 7, at 1; *see also Justice Department Secures Landmark Resolution to End Pediatric "Gender-Affirming Care" and Create Detransition Clinic*, U.S. DEP'T OF JUST.: OFF. OF PUB. AFFS. (May 15, 2026), https://www.justice.gov/opa/pr/justice-department-secures-landmark-resolution-end-pediatric-gender-affirming-care-and [https://perma.cc/9DG7-4UJD] (quoting defendant Blanche as stating that "[t]he Justice Department will use every weapon at its disposal to end … so-called 'gender-affirming care' for children").

[53] Memorandum from Attorney General Pamela Bondi, *supra* note 7, at 5; *Justice Department Secures Landmark Resolution*, *supra* note 52.

embarrassing. Because the Texas Attorney General has suggested that the parents of transgender minors who receive gender-affirming care should be investigated for child abuse,[54] several plaintiff-parents understandably fear that the disclosure of their children's information to DOJ might lead to investigations of their families.[55] The Court might in other cases have questioned the likelihood of California residents being targeted with criminal investigations in Texas, but the circumstances of this action suggest that such prosecutions are indeed possible.

Grand jury secrecy may, of course, mitigate the potential for harm from the unauthorized disclosure of provisional class members' private health information to DOJ. But for the reasons above, a potential for harm remains.

**c. The Degree of Need for Access**

Although DOJ previously sought the information at issue here through an administrative subpoena, it now does so through a grand jury subpoena issued under the seal of the Northern District of Texas. Because DOJ has identified no other purpose for its pursuit of the information, the extent of DOJ's legitimate need for access is coextensive with the grand jury's interest in the information.

"It is axiomatic that the grand jury sits … to assess whether there is adequate basis for bringing a criminal charge." *United States v. Williams*, 504 U.S. 36, 51 (1992); *see also United States v. Wiseman*, 991 F.2d 804 (9th Cir. 1993), *as amended on denial of reh'g* (Nov. 24, 1993). As DOJ argues, the grand jury enjoys wide-ranging investigatory authority. *See R. Enters.*, 498 U.S. at 297. But because it wields that authority to the ultimate end of determining whether to indict, "[t]he investigatory powers of the grand jury are … not unlimited." *Id.* at 299. DOJ's internal guidance reflects this, explaining that "[t]he grand jury's power, although expansive, is limited by its function toward possible return of an indictment." U.S. Dep't of Just., Just. Manual § 9-11.120 (2018) (citing *Costello v. United States*, 350 U.S. 359, 362 (1956)). Accordingly, when DOJ issues a subpoena in furtherance of a grand jury investigation, there must be at least a

[54] *AG Paxton Declares So-Called Sex-Change Procedures on Children and Prescription of Puberty Blockers to be "Child Abuse" Under Texas Law*, *supra* note 49.

[55] A.G. Decl., Dkt. No. 45-6 ¶ 6; B.B. Decl., Dkt. No. 45-7 ¶ 12; G.G. Decl., Dkt. No. 45-8 ¶ 11.



United States District Court
Northern District of California

"reasonable possibility that the category of materials [DOJ] seeks will produce information relevant to the general subject of the grand jury's investigation," i.e., to the existence of a basis for an indictment. *R. Enters.*, 498 U.S. at 301. Because the sensitive patient information demanded by DOJ has no obvious relevance to an indictment in the Northern District of Texas, DOJ likely lacks a meaningful need for access to such information.

DOJ insists that the Court cannot fairly probe the grand jury subpoena's potential relevance to an investigation in Texas because grand jury secrecy requirements prevent DOJ from explaining the nature of that investigation. That is not quite true. It is within DOJ's authority to petition the Texas court for authorization to disclose grand jury matters in connection with this proceeding. *See* Fed. R. Crim. P. 6(e)(3)(E)(i). Should it receive such authorization, DOJ may of course request that this Court review any materials *in camera* as needed to preserve grand jury secrecy. *Cf. R. Enters.*, 498 U.S. at 301–02. Thus, moving forward, grand jury secrecy should not tie DOJ's hands. And while the general rule of grand jury secrecy restricted DOJ's ability to explain the relevance of the requested patient records for purposes of opposing preliminary injunctive relief, the record is clear enough for the Court to conclude that, even with greater explanation, DOJ likely could not show any reasonable possibility that the subpoena is relevant to a valid grand jury investigation designed to return indictments out of the Northern District of Texas.

As an initial matter, it is difficult to conceive of a potential criminal offense for which an investigation "would require … identifying and sensitive medical information for an entire class of people for a six-year period." Teleconference Decision at 22, *Coe*, No. 26-cv-4641, Dkt. No 89 at 25. But the Court need not guess at the criminal conduct the grand jury is investigating. The grand jury subpoena to Packard mirrors the scope of the administrative subpoenas DOJ previously issued to Packard and to other hospitals pursuant to its authority under 18 U.S.C. § 3486(a)(1)(A)(i)(I) to investigate "federal healthcare offenses," like violations of the Food, Drug, and Cosmetic Act (FDCA). *See, e.g.*, *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *4; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *1; *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 569 n.57. DOJ issued the grand jury subpoena the day after it withdrew the

substantively identical administrative subpoena it had served on Packard, so it is hardly a logical leap to conclude that the subpoenas concern the same potential FDCA violations. And DOJ has repeatedly stated that it intends to investigate providers of gender-affirming care for misbranding and fraudulent billing in violation of the FDCA and, relatedly, for fraudulent insurance claims in violation of the False Claim Act.[56]

Some of the non-patient records DOJ demands from Packard, which neither Packard nor plaintiffs seek to protect, may be relevant to such FDCA and False Claims Act violations. But the requests challenged here concern "child-patients' identities and highly sensitive medical information … reflect[ing] individualized clinical care and deeply personal medical disclosures," including "psychosocial evaluations, diagnoses, treatment rationales, informed-consent forms, intake assessments, and family-authorization documents." *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 578. As other courts have ably explained, that information has no discernible relevance to any federal healthcare offense or other fraudulent billing or insurance-claim practices. *Id.*; *see also In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *see also QueerDoc, PLLC*, 807 F. Supp. 3d at 1304; *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *4–5. The Court agrees with, and adopts, these other courts' analysis.

Even if the sensitive patient information DOJ demands is possibly relevant to the existence of some chargeable offense, the record before the Court evinces virtually no chance that the information is relevant to an offense chargeable in the Northern District of Texas. As discussed above, the grand jury's ultimate purpose is to decide whether to return an indictment. And an indictment must allege facts that would sustain venue in the district of prosecution. *See United States v. Ghanem*, 993 F.3d 1113, 1120 (9th Cir. 2021). For that reason, DOJ's internal guidance instructs that "[a] case should not be presented to a grand jury in a district unless venue for the offense lies in that district." U.S. Dep't of Just., Just. Manual § 9-11.121 (2018). The proper venue

[56] *See, e.g.*, Memorandum from Attorney General Pamela Bondi to Select Component Heads, "Preventing the Mutilation of American Children," *supra* note 7, at 4; Memorandum from Assistant Attorney General Brett A. Shumate, *supra* note 11, at 2; *Justice Department Secures Landmark Resolution to End Pediatric "Gender-Affirming Care" and Create Detransition Clinic*, *supra* note 52.

in a federal criminal action is generally the district "where the crime was committed," which is "the place of the crime's conduct elements—the acts that the prosecution must prove to secure a conviction." *Abouammo v. United States*, No. 25-5146, 2026 WL 1686084, at *4 (U.S. June 11, 2026) (citation modified). The appropriate scope of a grand jury investigation will thus usually be limited to potential criminal conduct in the district in which the grand jury sits unless the investigation concerns potential multi-district offenses. For there to be a reasonable possibility that the material demanded by a grand jury subpoena is relevant to the grand jury's investigation, then, the material must ordinarily have some connection to potential in-district conduct. In *R. Enterprises*, for example, the Supreme Court upheld a grand jury subpoena issued from the Eastern District of Virginia to a group of New York companies that had shipped sexually explicit materials into Virginia. 498 U.S. at 295. Yet the patient records demanded by the grand jury subpoena issued to Packard have no apparent nexus to the Northern District of Texas—DOJ is demanding information about patients who received care in California from an institution that is located in California and has no documented connection to Texas. Nothing in the record suggests that such records relate to a potential multi-district offense that might allow prosecution in Texas for criminal conduct occurring in California. *See id.*

DOJ resists this conclusion by pointing to Rule 17's provision authorizing service of criminal subpoenas "at any place within the United States." Fed. R. Crim. P. 17(e). That provision simply acknowledges that individuals outside a particular district may nevertheless possess evidence of potential relevance to criminal conduct within the district. It does not suggest that grand jury subpoenas may demand records absent a reasonable possibility of relevance to crimes chargeable in the district where the grand jury sits (i.e., to in-district conduct). And the text of Rule 17's nationwide-service provision suggests that it relates primarily to subpoenas compelling out-of-district witnesses to testify, rather than grand jury demands for out-of-district records. *See id.* (referring specifically to a "subpoena requiring a witness to attend a hearing or trial").

The record before the Court thus establishes that there is little to no possibility that the patient information DOJ demands will be of any relevance to the grand jury investigation in Texas. Because that is DOJ's only present basis for asserting an interest in the information, its

"degree of need for access" to the information is, at most, minimal.

**d. The Public Interest**

Finally, the Court must consider "whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access." *Tucson Woman's Clinic*, 379 F.3d at 551. DOJ again gestures to the general public policy against unduly burdening grand jury investigations. *See R. Enters.*, 498 U.S. at 298. But the Supreme Court has made clear that this policy does not authorize "fishing expeditions" or demands for records for which there is not a reasonable possibility of relevance to the existence of an indictable offense. *See id.* at 299–301. So the policy does not favor DOJ's access to the patient information at issue in this case.

On balance, the provisional class members' individual interests in maintaining the privacy of their highly sensitive medical information—the disclosure of which carries a risk of harm—likely outweighs DOJ's negligible interest in obtaining such information, which is almost certainly irrelevant to the Texas grand jury investigation. *See Tucson Woman's Clinic*, 379 F.3d at 551. Assuming the viability of their equitable cause of action, plaintiffs are therefore likely to succeed on the merits of their Fifth Amendment informational-privacy claim.

**B. The provisional Packard class will likely suffer irreparable harm absent an injunction.**

Members of the provisional Packard class will likely suffer immediate and irreparable harm without preliminary injunctive relief. "[W]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary" once plaintiffs have established a likely constitutional violation. *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (citation modified); *see also Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) ("[I]t follows inexorably from [the] conclusion that the government's [conduct is] likely unconstitutional … that [p]laintiffs have also carried their burden as to irreparable harm.").

In any event, plaintiffs have established that provisional class members will suffer irreparable harm absent an injunction due to the near-certain disclosure of their "personal medical information," which is "among the most sensitive information that could be collected about a person." *Doe v. GoodRx Holdings, Inc.*, No. 23-CV-00501, 2025 WL 2052302, at *15 (N.D. Cal.

July 22, 2025) (citation modified) (quoting *Doe v. Regents of Univ. of Cal.*, 672 F. Supp. 3d 813, 820 (N.D. Cal. 2023)). As amicus the American Academy of Pediatrics explains, and as several parent-plaintiffs' declarations bear out, such disclosure would negatively impact minor patients' healthcare because "[a]dolescents will discuss fewer topics overall, and fewer confidential topics, with the their health care professionals if they cannot be assured that clinicians' discussion with them and their family members will be kept confidential."[57] Some "may not seek care at all."[58] The disclosure of such information would also 'out' provisional class members as transgender to a federal government that for more than a year has "sought to identify, to demonize, and ultimately to eradicate an entire population of transgender people." Transcript of Teleconference Decision at 5, *Coe*, No. 26-cv-4641, Dkt. No 89 at 8. Such disclosure and the attendant loss of privacy, chilling of doctor-patient communications, and risk of governmental harassment cannot be undone. *Cf. In re Copley Press, Inc.*, 518 F.3d 1022, 1025 (9th Cir. 2008) ("Secrecy is a one-way street: Once information is published, it cannot be made secret again.").

DOJ argues that the provisional class faces no risk of irreparable harm for the same reasons DOJ argues that plaintiffs' informational-privacy claim fails. That is, DOJ suggests that plaintiffs cannot reasonably expect privacy because Packard's current privacy notice states that the hospital may disclose personal health information for law-enforcement purposes, and DOJ insists that grand jury secrecy requirements will adequately protect class members' privacy interests. The Court rejects these arguments for the reasons noted above.

---

[57] Brief of Amicus Curiae American Academy of Pediatrics in Support of Plaintiffs' Motion for a Temporary Restraining Order, Dkt. No. 73, at 9 (citing Amy Lewis Gilbert et al., *Clinical Conversations About Health: The Impact of Confidentiality in Preventive Adolescent Care*, 55 J. ADOLESCENT HEALTH. 672, 672–77 (2014); *see also* A.G. Decl., Dkt. No. 45-6 ¶ 7 ("Disclosure would discourage my family from seeking for my child in the future."); B.B. Decl., Dkt. No. 45-7 ¶ 13 ("Disclosure would ruin our trust in the medical system."); G.G. Decl., Dkt. No. 45-8 ¶ 13 ("Disclosure would affect our family's willingness to seek care and share sensitive information in the future … If [Packard] turns over our information, it would be incredibly difficult to return there, but equally difficult to find providers anywhere in the United States who are as competent and whom my daughter would trust.").

[58] *Id.* (citing Richard J. Chung et al., *Confidentiality in the Care of Adolescents: Technical Report*, 153 PEDIATRICS e2024066327 (2024), at 4).



United States District Court
Northern District of California

**C. The balance of equities and public interest tip sharply in plaintiffs' favor.**

The final two *Winter* factors—the balance of the equities and public interest—merge because the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tip sharply in plaintiffs' favor. "Because public interest concerns are implicated when a constitutional right has been violated, all citizens have a stake in upholding the Constitution, meaning it is always in the public interest to prevent the violation of a party's constitutional rights." *Baird*, 81 F.4th at 1042. In contrast to the irreparable harm faced by the provisional Packard class and the strong public interest in preventing those likely unconstitutional harms, DOJ has not established that preliminary injunctive relief would injure it in any meaningful way. As a general matter, the government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (holding that the government "cannot suffer harm from an injunction that merely ends an unlawful practice" implicating "constitutional concerns"), *abrogated on other grounds by Jennings v. Rodriguez*, 583 U.S. 281 (2018). And as the Court has already explained, DOJ lacks any discernibly legitimate interest in reviewing private and identifying medical information about the provisional class. To the extent that DOJ and the grand jury in Texas have legitimate reasons for investigating Packard for its provision of gender-affirming care—which is doubtful—plaintiffs' requested injunction does nothing to prevent DOJ from seeking other records that might actually be relevant to that investigation. Indeed, Packard's counsel has attested that Packard already produced other records to DOJ in response to the administrative subpoena.[59] And even if DOJ has a particular need for identifying health information about individual members of the provisional class, DOJ's conduct suggests that the need is not urgent: DOJ took no action to compel disclosure of such information for nine months after first serving Packard with its administrative subpoena.[60]

Plaintiffs have raised serious questions, and potentially a likelihood of success, as to DOJ's argument that they lack an equitable cause of action and have established a likelihood of success

---

[59] *See* Schumacher Decl., Dkt. No. 31-1 ¶ 3.

[60] *Id.* ¶¶ 2–4.

on their informational-privacy claim, a likelihood of irreparable harm, and that the balance of equities and public interest tip sharply in their favor. Preliminary injunctive relief is therefore appropriate as to the provisional Packard class.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to proceed via pseudonym (Dkt. No. 42) is GRANTED. Plaintiffs' motions for provisional class certification (Dkt. No. 45) and for a preliminary injunction (Dkt. No. 46) are GRANTED in part and DENIED in part.

DOJ and Acting Attorney General Blanche, and all persons acting in concert with or on behalf of such defendants, are hereby ENJOINED from requesting, receiving, producing, transmitting, disclosing, or otherwise obtaining any records, documents, or information that (1) identify members of the provisional class as having sought or received gender-affirming care (or "Sex-Rejecting Procedures"); (2) disclose the clinical indications, diagnoses, assessments, or other sensitive health information underlying the provision of such care to members of the provisional class; (3) describe the gender-affirming care (or "Sex-Rejecting Procedures") provided to members of the provisional class or any consultations or patient intakes related to such care; or (4) relate to the provision of informed consent and parent or guardian authorization for provisional class members' receipt of gender-affirming care (or "Sex-Rejecting Procedures"). Absent a further order from this Court, the injunction shall remain in effect during the pendency of these proceedings.

**IT IS SO ORDERED.**

Dated: July 2, 2026

P. Casey Pitts
United States District Judge